The **AMERICAN AGRICULTURE MOVEMENT, INC., et al.,** Plaintiffs,

v.

The **BOARD OF TRADE OF the CITY OF CHICAGO, et al., Defendants.**

No. 89 C 8467.

United States District Court, N.D. Illinois, E.D.

July 10, 1991.

John F. Arens, Steve Alexander, Arens & Alexander, Fayetteville, Ark., Patrick F. Daly (Local Counsel), Palos Heights, Ill., for plaintiffs.

Garrett B. Johnson, John E. Angle, Robert S. Steigerwald, Sara R. Slaughter, Kirkland & Ellis, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Plaintiff American Agriculture Movement, Inc. ("AAM") is a national organization which represents and advocates the interests of American farmers. The other named plaintiffs are individual members of AAM and a corporation wholly-owned by another individual AAM member. Plain-tiffs sued the Chicago Board of Trade ("CBOT"), twenty-one individual members of the Board of Directors of the CBOT ("Directors"), and five individual members of the Business Conduct Committee of the CBOT ("Committeemen") under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, the Sherman Anti–Trust Act ("Sherman Act"), 15 U.S.C. § 1 *et seq.*, and state common law. This court dismissed plaintiffs' CEA claim for lack of statutory standing on April 23, 1990. Before the court is defendants' motion for summary judgment with respect to the Sherman Act and common law claims. For the following reasons, defendants' motion for summary judgment is granted.

## STATUTORY AND REGULATORY SCHEME

The CEA is a comprehensive federal statute which regulates the trading of agricultural and other commodities on exchanges. Its predecessor, the Grain Futures Act, was first enacted in 1922. One of Congress' fundamental purposes in enacting the CEA was to ensure fair practice and honest dealings on commodity exchanges as well as to protect those who could be injured by unreasonable fluctuations in commodity prices. *Tamari v. Bache & Co. S.A.L.*, 730 F.2d 1103, 1106 (7th Cir.1984).

The CEA establishes the five-member Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 4a(a)(1). The CEA authorizes the CFTC "to promulgate such rules and regulations as *in the judgment of [the CFTC]* are reasonably necessary to effectuate any of the provisions or accomplish any of the purposes of [the CEA]." 7 U.S.C. § 12a(5) (emphasis added). The CEA also authorizes the CFTC to designate any board of trade as a "contract market" if that board of trade complies with certain statutory requirements. 7 U.S.C. § 7. One of these statutory requirements is that "the governing board [of the board of trade] [must] provide[ ] for the prevention of manipulation of prices and the cornering of any commodity by the dealers or operators upon such board [of trade]." 7 U.S.C.

§ 7(d); *cf.* 17 C.F.R. § 1.51(a)(1) (contract market "shall" monitor market activity "for indications of possible congestion or other market situations conducive to possible price distortions"). The CEA also requires a designated contract market to enforce any bylaws, rules, regulations, or resolutions which it promulgates. 7 U.S.C. § 7a(8). Furthermore, the CEA expressly provides as follows:

> The [CFTC] shall specify the terms and conditions under which a contract market may, in an emergency *as defined by the [CFTC]*, make a rule effective on a temporary basis without prior [CFTC] approval ... In the event of such an emergency, *as defined by the [CFTC]*, requiring immediate action, the contract market by a two-thirds vote of its governing board may immediately make effective a temporary rule dealing with such emergency if the contract market notifies the [CFTC] of such action with a complete explanation of the emergency involved.

7 U.S.C. § 7a(12) (emphasis added).

The CFTC has promulgated a regulation which defines an "emergency" as, *inter alia:*

> [a]ny ... occurrence or circumstance which, *in the opinion of the governing board of the contract market,* requires immediate action and threatens or may threaten such things as the fair and orderly trading in, or liquidation of or delivery pursuant to, any contract for the future delivery of a commodity or any commodity option on such contract market. Occurrences and circumstances which a governing board of a contract market may deem emergencies include, but are not limited to:
>
> .   .   .   .   .
>
> (B) Any actual, attempted, or threatened corner, squeeze, congestion, or undue concentration of positions.

17 C.F.R. § 1.41(a)(4)(ii)(B) (emphasis added). The CFTC has specifically authorized a contract market to respond to such an "emergency" by issuing an order directing contract liquidation. 17 C.F.R. § 1.41(f)(3)(v).

Prior to 1982, there was no express private right of action for violations of the CEA. Nevertheless, prior to 1974, various lower courts had implied a private right of action under the CEA. In 1974, Congress amended the CEA but did not restrict or prohibit the private right of action thereunder which the various lower courts had implied. Because of this Congressional inaction, the Supreme Court held in 1982 that there was indeed a private right of action under the CEA. *Merrill Lynch, Pierce, Fenner & Smith v. Curran, Inc.,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). Eight months after the Court decided *Curran,* Congress enacted the Futures Trading Act of 1982 which amended the CEA to, *inter alia,* add § 25 which is captioned "Private Rights of Action". The current version of the CEA expressly grants private parties a right of action against a contract market such as the CBOT which "in enforcing any ... bylaw, rule, regulation, or resolution violates [the CEA] or any [CFTC] rule, regulation, or order." 7 U.S.C. § 25(b)(1)(C). The CEA also grants private parties a right of action against "[a]ny individual who, in the capacity as an officer, director, ... [or] committee member" "wilfully aids, abets, counsels, induces, or procures" such a violation by a contract market. 7 U.S.C. § 25(b)(3). There are, however, important restrictions on these express private rights of action which do not apply to actions brought against other defendants. Two of these restrictions are relevant in this case. First, *only* "a person who engaged in any transaction on or subject to the rules of [a] contract market" may assert such a right of recovery. 7 U.S.C. § 25(b)(1)(C), (b)(3). Second, *no one* can recover against a contract market or a director, officer, or committee member of a contract market unless the putative defendant "acted in bad faith in failing to take action or in taking such action as was taken ..." 7 U.S.C. § 25(b)(4).[1] This court has already held

---

1. The CEA expressly provides that "the rights of action authorized by [§ 25(b)] shall be the ex-    clusive remedy *under th[e] [CEA]* to any person who sustains a loss as a result of ... the taking

that plaintiffs do not satisfy the first restriction and therefore cannot recover against defendants under the CEA. *The American Agriculture Movement v. Board of Trade*, 1990 WL 71025, 1990 U.S. Dist. Lexis 4970 (1990).

## BACKGROUND

Summary judgment is appropriate if "the pleadings, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law...." Fed.R.Civ.P. 56(c). The undisputed material facts in this case are summarized below.

The CFTC has designated the CBOT as a contract market under the CEA. Pursuant to the request of the Committeemen, on July 11, 1989, the Directors, by a sixteen to one vote,[2] adopted a resolution ("the Resolution") to address an emergency which the Committeemen and Directors believed existed regarding the July 1989 soybean futures contract traded at the CBOT. The emergency consisted of a threat to "fair and orderly trading in the liquidation of, and delivery pursuant to, the July 1989 soybean futures contract" caused by Ferruzzi Finanziara S.p.A.'s control of almost 60% of the long open interest in July soybean futures and more than 60% of cash soybeans in deliverable locations.[3] In an effort to deal with this stated emergency, the Resolution ordered, *inter alia:* (1) that any person or entity who owned or controlled a gross long or gross short position in the July 1989 soybean futures contract in excess of three million bushels must reduce his or its position "by at least 20% per trading day", and (2) that no person or entity could own or control a gross long or gross short position in the July 1989 soybean futures contract in excess of three

million bushels as of the close of trading on Tuesday, July 18, 1989 and in excess of one million bushels as of the close of trading on Thursday, July 20, 1989. The Resolution expressly stated that its provisions were applicable "to all positions, whether hedge or speculative". Since the CBOT had, at the time, an internal rule requiring public disclosure of emergency orders, it was required, pursuant to 7 U.S.C. § 7a(8), to disclose the Resolution to the public. The CBOT did so on July 12, 1989.

The CFTC subsequently investigated the events which led to the Resolution and, on September 7, 1989, issued its determination that the market situation addressed by the Resolution had constituted an "emergency" as that term is defined by the CFTC. The CFTC was aware of the fact that five Directors and two Committeemen were affiliated with firms that held gross short positions in July 1989 soybeans and determined that none of the participating CBOT Directors and Committeemen traded "for the purpose of profiting personally or through an affiliated firm from advance knowledge of the July 11 order." The CFTC further concluded that the CBOT "followed required and reasonable procedures in its decision making process, had a reasonable basis for its action, and did not act in bad faith."

After the CFTC issued this determination, the Senate Agriculture Committee asked the United States General Accounting Office ("GAO") to conduct its own examination of the events which led to the Resolution. In an April 9, 1990 report, the GAO agreed with the CFTC's conclusion that the CBOT and the directors had acted in good faith without conflict of interest and "that [the CBOT] was in compliance with CFTC requirements."

Plaintiffs did not appreciate defendants' promulgation and public disclosure of the

---

of action in enforcing any bylaw, rule, regulation, or resolution ... that is alleged to have violated this chapter, or any [CFTC] rule, regulation, or order." 7 U.S.C. § 25(b)(5)(B).

**2.** None of the sixteen Directors who voted in favor of the Resolution owned or controlled personal positions in July 1989 soybeans. Five of the sixteen Directors who voted in favor of

the Resolution, as well as two Committeemen, were affiliated with firms that held gross short positions in July 1989 soybeans.

**3.** Ferruzzi's position was more than four times larger than the deliverable soybean stocks available to other market participants.

Resolution because, they argue, this action caused the cash price of their soybean crops to plummet.

## ANALYSIS

Defendants' argue: (1) that plaintiffs cannot establish a claim under the Sherman Act absent a showing of bad faith on the part of defendants (even though the Sherman Act does not expressly require such a showing); and (2) that the common law does not recognize causes of action such as those asserted by plaintiffs on the facts of this case. Plaintiffs in turn argue that they need not prove bad faith, and that in the event this court disagrees, it should lift its partial discovery stay to permit them to, *inter alia,* depose 27 identified people and numerous other unnamed people in an extensive search for evidence thereof. Plaintiffs also argue that the common law does give them causes of action on the facts of this case. Neither plaintiffs nor defendants address the two issues which the court deems to be dispositive of this motion: (1) whether the CEA impliedly repealed the Sherman Act as applied to the facts of the case at bar, and (2) whether the CEA pre-empts these plaintiffs' common law claims.[4]

### Implied Repeal Of Sherman Act

■ The Supreme Court has summarized the general principles governing the resolution of the issue of implied repeal of the antitrust laws by a subsequently-enacted statute as follows:

> The general principles applicable to … claims [of antitrust immunity] are well established. The antitrust laws represent a 'fundamental national economic policy.' … 'Implied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system….' 'Repeal is to be regarded as implied only if necessary to make the [subsequent law] work, and

even then, only to the minimum extent necessary'….

> To be sure, when Congress did intend to repeal the antitrust laws, that intent governs, … but this intent must be clear. Even when an industry is regulated substantially, this does not necessarily evidence an intent to repeal the antitrust laws with respect to every action taken within the industry…. *Intent to repeal antitrust laws is much clearer when a regulatory agency has been empowered to authorize or require the type of conduct under antitrust challenge….*

*National Gerimedical Hospital v. Blue Cross,* 452 U.S. 378, 388–389, 101 S.Ct. 2415, 2421–2422, 69 L.Ed.2d 89 (1981) (emphasis added) (citations omitted).

The Supreme Court first dealt with the specific issue of the applicability of the antitrust laws to securities exchanges regulated by the Securities Exchange Act of 1934 ("SEA") in *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). In *Silver,* an individual municipal bonds and securities broker-dealer and two of his companies, all located in Texas, obtained direct private telephone wire connections with thirteen securities firms which were members of the New York Stock Exchange ("NYSE"). These member firms were required by the NYSE's rules to apply to the NYSE for approval of the connections. The NYSE granted "temporary approval" of the connections. Approximately six to eight months later, the NYSE disapproved the private wire applications without giving either prior notice or a subsequent explanation to the individual petitioner and his two companies. The individual petitioner claimed that the NYSE's disapproval caused one of his companies to go out of business and the other one to lose most of its business. The individual petitioner, as proprietor of one of his companies, and the other company, a corporation, filed suit against the NYSE alleging, *inter alia,* that

---

4. Defendants did make both of these arguments in their motion to dismiss and plaintiffs fully responded thereto in their response to that motion. This court denied defendants' motion to dismiss plaintiffs' Sherman Act and common law claims because defendants' motion to dismiss essentially requested the court to consider facts outside the complaint.

the NYSE violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, by conspiring with its member firms to deprive petitioners of their private wire connections. The district court entered summary judgment against the NYSE on this count holding that the Sherman Act applied to the NYSE's disapproval of the private telephone lines. A divided panel of the Court of Appeals reversed, holding that the NYSE was "exempt from the restrictions of the Sherman Act because it [was] exercising a power which it [was] required to exercise by the [SEA]." The Supreme Court reversed the court of appeals.

The Supreme Court began its analysis with the observation that "absent any justification derived from the policy of another statute or otherwise, the [NYSE] acted in violation of the Sherman Act." *Silver* at 348–349, 83 S.Ct. at 1252–1253. "[T]he presence of another statutory scheme, that of the [SEA], means that such a conclusion is only the beginning, not the end, of the [justification] inquiry." *Id.* at 349, 83 S.Ct. at 1252.

The Court rejected the reasoning of both the district court and the court of appeals as follows:

[T]he case cannot be disposed of by holding as the district judge did that the substantive act of [self] regulation engaged in here [by the NYSE] was outside the boundaries of the public policy established by the [SEA].

But it does not follow that the case can be disposed of, as the Court of Appeals did, by holding that since the [NYSE] has a general power to adopt rules governing its members' relations with nonmembers, particular applications of such rules are therefore outside the purview of the antitrust laws. Contrary to the conclusions reached by the courts below, the proper approach to this case, in our view, is an analysis which reconciles the operation of both schemes with one another rather than holding one completely ousted.

*Id.* at 356–357, 83 S.Ct. at 1256–1257. The Court began its reconciliation analysis by noting that the SEA "contains no express exemption from the antitrust laws or, for

that matter, from any other statute." *Id.* at 357, 83 S.Ct. at 1257. Thus,

any repealer of the antitrust laws must be discerned as a matter of implication, and 'it is a cardinal principle of construction that repeals by implication are not favored.' ... Repeal is to be regarded as implied only if necessary to make the [SEA] work, and even then only to the minimum extent necessary. This is the guiding principle to reconciliation of the two statutory schemes.

*Id.* at 357, 83 S.Ct. at 1257 (citations omitted).

Applying this "guiding principle" to the facts of the case before it, the Court noted that while the SEA gives the SEC the power to request securities exchanges to change their *rules,* "it does not give the Securities and Exchange Commission [("SEC")] jurisdiction to review particular instances of *enforcement* of exchange rules." *Id.* (emphasis added). Thus, the Court reasoned, "the question of antitrust exemption does not involve any problem of conflict or coextensiveness of coverage with the agency's regulatory power.... The issue is only that of the extent to which the character and objectives of the duty of exchange self-regulation contemplated by the [SEA] are incompatible with the maintenance of an antitrust action." *Id.* at 358, 83 S.Ct. at 1257 (citations and footnote omitted). The Court resolved this issue as follows:

Enforcement of exchange rules, ... may well, in given cases, result in competitive injury to an issuer, a nonmember broker-dealer, or another when the imposition of such injury is not within the scope of the great purposes of the [SEA]. Such unjustified self-regulatory activity can only diminish public respect for and confidence in the integrity and efficacy of the exchange mechanism. Some form of review of exchange self-policing, whether by administrative agency or by the courts, is therefore not at all incompatible with the fulfillment of the aims of the [SEA] ... *Should review of exchange self-regulation be provided through a vehicle other than the antitrust laws, a*

*different case as to antitrust exemption would be presented.*

*Id.* at 359–360, 83 S.Ct. at 1258–1259 (emphasis added). In the same vein with the above-emphasized caveat, the Court also stated, in a footnote, as follows: "Were there [SEC] jurisdiction and ensuing judicial review for scrutiny of a particular exchange ruling, ... a different case would arise concerning exemption from the operation of laws designed to prevent anticompetitive activity, an issue we do not decide today." *Id.* at 358, n. 12, 83 S.Ct. at 1257, n. 12.[5]

In *Gordon v. New York Stock Exchange Inc.,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), the Supreme Court was presented with the "different case" mentioned in *Silver* and resolved the issue it left open in that case. The plaintiff in *Gordon* had sued, *inter alia,* the NYSE and the American Stock Exchange (collectively, "Exchanges") alleging, *inter alia,* that the system of fixed commission rates which the Exchanges used for transactions involving less than $500,000 violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. The district court granted the Exchanges' motion for summary judgment on the Sherman Act count holding that the SEA impliedly repealed the Sherman Act on the facts of the case before it. The court of appeals and then the Supreme Court affirmed.

The Supreme Court found the SEC's involvement in the Exchanges' rate-setting practices to be dispositive. The Court summarized this involvement as follows:

> In enacting the [SEA], the Congress gave clear authority to the SEC to supervise exchange self-regulation with respect to the 'fixing of reasonable rates of commission.' Upon SEC determination that exchange rules or practices regarding commission rates required change in order to protect investors or to insure fair dealing, the SEC was authorized to require adoption of such changes as were deemed necessary or appropriate.... Since the [SEA's] adoption, and primarily

in the last 15 years, the SEC has been engaged in the thorough review of exchange commission rate practices....

*Id.* at 681–682, 95 S.Ct. at 2610–2611 (emphasis omitted). The Court began its analysis by distinguishing the case before it from *Silver* as follows:

> In contrast to the circumstances in *Silver,* [the SEA] gave the SEC direct regulatory power over exchange rules and practices with respect to 'the fixing of reasonable rates of commission'. Not only was the SEC authorized to disapprove rules and practices concerning commission rates, but the agency also was permitted to require alteration or supplementation of the rules and practices when 'necessary or appropriate for the protection of investors or to insure fair dealings in securities traded in upon such exchange.' Since 1934, all rate changes have been brought to the attention of the SEC, and it has taken an active role in review of proposed rate changes during the last 15 years. Thus, rather than presenting a case of SEC impotence to affect application of exchange rules in particular circumstances [as was the case in *Silver*], this case involves explicit statutory authorization for SEC review of all exchange rules and practices dealing with rates of commission and resultant SEC continuing activity.

*Id.* at 685, 95 S.Ct. at 2612–2613. Having concluded that the case before it was the "different case" to which the *Silver* Court referred, the *Gordon* Court then addressed the issue of whether implied repeal of the antitrust laws on the facts of *Gordon* was "necessary to make the [SEA] work." The Court reasoned as follows:

> [T]o deny antitrust immunity with respect to commission rates would be to subject the exchanges and their members to conflicting standards. It is clear ... that the commission rate practices of the exchanges have been subjected to the scrutiny and approval of the SEC. If antitrust courts were to impose different

---

**5.** For reasons not relevant to the case at bar, the *Silver* Court concluded that the NYSE's disapproval of the wire connections at issue without

affording the petitioners notice and an opportunity to be heard was indeed an "unjustified self-regulatory activity."

standards or requirements, the exchanges might find themselves unable to proceed without violation of the mandate of the courts or of the SEC. Such different standards are likely to result because the sole aim of antitrust legislation is to protect competition, whereas the SEC must consider, in addition, the economic health of the investors, the exchanges, and the securities industry. Given the expertise of the SEC, the confidence the Congress has placed in the agency, and the active roles the SEC and the Congress have taken, permitting courts throughout the country to conduct their own antitrust proceedings would conflict with the regulatory scheme authorized by Congress rather than supplement that scheme.

*Id.* at 689–690, 95 S.Ct. at 2614–2615 (footnotes omitted). In a footnote in the above-quoted passage, the Court equated the SEC's "scrutiny and approval" of the Exchanges' commission rate-setting practice with an express order from the SEC to the Exchanges to do that which they did with respect to commission rate-setting:

We believe that this degree of scrutiny and approval by the SEC is not significantly different for our purposes here than an affirmative order to the exchanges to follow fixed rates. The United States, as *amicus curiae*, agrees that if the SEC 'were to order the exchanges to adhere to a fixed commission rate system of some kind, no antitrust liability could arise.' ... We conclude that immunity should not rest on the existence of a formal order by the SEC, but that the actions taken by the SEC [summarized above] are to be viewed as having an effect equivalent to that of a formal order.

*Id.* at 689, n. 13, 95 S.Ct. at 2614–2615 n. 13.

Finally, the *Gordon* Court summarized the factors upon which it based its decision as follows:

In sum, the statutory provision authorizing regulation, ... the long regulatory practice, and the continued congressional approval illustrated by the new legisla-tion, point to one, and only one, conclusion. The [SEA] was intended by the Congress to leave the supervision of the fixing of reasonable rates of commission to the SEC. Interposition of the antitrust laws, which would bar fixed commission rates as *per se* violations of the Sherman Act, in the face of positive SEC action, would preclude and prevent the operation of the [SEA] as intended by Congress and as effectuated through SEC regulatory activity. Implied repeal of the antitrust laws is, in fact, necessary to make the [SEA] work as it was intended; failure to imply repeal would render nugatory the legislative provision for regulatory agency supervision of exchange commission rates.

*Id.* at 691, 95 S.Ct. at 2615.

Although *Silver* and *Gordon* both involved the issue of whether the SEA impliedly repealed the antitrust laws, the analyses in those cases apply equally to the issue of whether the CEA impliedly repealed the antitrust laws in this case. *See e.g. Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 302, 93 S.Ct. 573, 580, 34 L.Ed.2d 525 (1973).

The Sherman Act was enacted in 1890. The Grain Futures Act, the predecessor of what is now the CEA, was enacted in 1922. No court has addressed the issue of whether the CEA impliedly repealed the antitrust laws on facts similar to those in the case at bar, namely, where a contract market governed by the CEA and regulated by the CFTC takes an action which is not only authorized by the CEA but which is approved by the CFTC (and the GAO) after the fact for compliance with, *inter alia,* the statutory requirement that a contract market, or a director, officer, or committee member thereof not act in bad faith.

While the CEA generally requires a contract market to submit to the CFTC any rules it promulgates pursuant to the CEA, the CEA does authorize a contract market to promulgate a rule without prior CFTC approval in the event of an emergency, "as defined by the [CFTC]" which requires "immediate action" so long as the contract market notifies the CFTC of the taking of

such action after the fact "along with a complete explanation of the emergency involved." 7 U.S.C. § 7a(12). The CFTC has defined an emergency as any occurrence or circumstance which "in the opinion of the governing board of the contract market" requires immediate action and "threatens or may threaten such things as the fair and orderly trading in, or liquidation of or delivery pursuant to any contract for the future delivery of a commodity ..." 17 C.F.R. § 1.41(a)(ii). The CFTC has expressly defined "[a]ny actual, attempted or threatened corner ... of positions" as such an occurrence or circumstance. 17 C.F.R. § 1.41(a)(4)(ii)(B).

In sum, Congress delegated to the CFTC the general authority to enforce the CEA, and specifically to define the term "emergency" as used in the CEA. The CFTC in turn defined that term and expressly deferred to "the opinion of the governing board of the contract market" to determine whether a given occurrence or circumstance constitutes an emergency. As long as a contract market and its directors, officers, and committee members do not act in bad faith, they cannot be held liable to any private party, even one who has standing to sue under the CEA. 7 U.S.C. § 25(b)(1)(C), (b)(3).

The CEA clearly states that the decision about whether an "emergency" exists is to made solely by the contract market. Thus, plaintiffs' argument that, in *their* opinion, there was no emergency which would justify defendants' taking of emergency action must fall on deaf ears. It is undisputed that defendants believed there was an emergency and that is enough to authorize them in the first instance to pass the Resolution subject to subsequent CFTC approval. It is also undisputed that the CFTC (and the GAO) did review the defendants' emergency action after the fact and found, *inter alia,* that there was indeed an emergency and that defendants did not act in bad faith in addressing that emergency.

Under the CEA, defendants cannot be held liable to plaintiffs unless they acted in bad faith. Plaintiffs contend that, notwithstanding the CFTC's contrary conclusion, defendants did indeed act in bad faith. But the good faith-bad faith issue is a red herring since this court has already held that plaintiffs cannot recover against defendants under the CEA for another reason— lack of statutory standing. Thus, for purposes of determining the possibility of defendants' liability to plaintiffs under the Sherman Act, the issue is not, as defendants claim, whether allowing plaintiffs to maintain an antitrust action against defendants *without having to prove bad faith* (proof of which the Sherman Act does not expressly require) would circumvent the purposes of the CEA's standing requirement. Rather, the issue is whether allowing plaintiffs to maintain an antitrust action against defendants *at all* would prevent the CEA from "work[ing] as it was intended". *Gordon,* 422 U.S. at 691, 95 S.Ct. at 2615. The answer to that question on the facts of this case must be a resounding "yes". Where a contract market, its directors, and committee members act pursuant to statutory authority, and where the regulatory agency charged with enforcing that statute approves the act as having been taken in compliance with the requirements of the statute, "to deny antitrust immunity with respect to [the action taken] would be to subject the exchange and [the directors and committeemen] to conflicting standards." *Gordon* at 689, 95 S.Ct. at 2614.

*Pre-emption Of Common Law Claims*

■ Plaintiffs also assert causes of action against defendants for common law negligence and breach of fiduciary duty. The Supreme Court has recently summarized the various situations in which a federal statute or regulation will be deemed to pre-empt state law pursuant to the supremacy clause of Article VI of the United States Constitution:

Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, ... when there is outright or actual conflict between federal and state law, ... where compliance with both federal and state law is in effect physically impossible, ... where there is implicit in federal law a

barrier to state regulation, ... where Congress has legislated comprehensively, thus occupying an entire field and leaving no room for the States to supplement federal law, ... or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.... Preemption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally-delegated authority may pre-empt state regulation. *Louisiana Public Service Commission v. F.C.C.,* 476 U.S. 355, 368–369, 106 S.Ct. 1890, 1898–1899, 90 L.Ed.2d 369 (1986) (citations omitted).

 Plaintiffs' common law claims against defendants are preempted by the CEA for two of the reasons stated in *Louisiana Public Service Commission.* Congress did not expressly provide that the CEA or any of its provisions pre-empts state law. Congress did, however, amend the CEA in 1982 to expressly grant private parties a right of action against persons who violate the CEA's provisions. At the same time, Congress placed restrictions on any such rights of action brought against contract markets and their directors, officers, and committee members, restrictions not applicable to actions brought against any other defendant. One of these restrictions is that the putative plaintiff must have standing in that he must have traded on the exchange.[6] Congress cannot have intended to place such a restriction on lawsuits against contract markets, their directors, officers, and committee members but at the same time leave them subject to liability under a common law theory. Put another way, Congress has expressly declared that contract markets and their directors, officers, and committee members do not owe a duty of any kind in their business capacity, much less a fiduciary duty, to anyone who has not traded on that contract market. To permit such a person to sue such defendants under common law theories which require proof of the existence of a duty owed by the defendants to

the plaintiff would eviscerate Congress' intent as expressed in § 25(b)(1)(C), (b)(3) of the CEA. Under this same rationale, this court also concludes that permitting plaintiffs to proceed with their common law claims against defendants would result in an outright conflict between the CEA and state common law.

## CONCLUSION

For the above-stated reasons, the CEA impliedly repealed the Sherman Act as applied to the facts of this case. Plaintiffs' common law claims are pre-empted by the CEA. Accordingly, defendants' motion for summary judgment as to plaintiffs' Sherman Act and common law claims is granted.

---

**6.** Another restriction, not relevant to the resolution of the pre-emption issue, is that a contract market and its directors, officers, and committee members are immune from CEA liability unless they acted in bad faith.