977 F.2d 1147
 61 USLW 2284, 1992-2 Trade Cases P 70,003
 AMERICAN AGRICULTURE MOVEMENT, INCORPORATED, H. Dean Adkins,
Judy F. Adkins, et al., Plaintiffs-Appellants,
v.
The BOARD OF TRADE OF the CITY OF CHICAGO, Patrick H. Arbor,
Donald G. Andrew, et al., Defendants-Appellees.
 No. 91-2845.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 2, 1992.
Decided Oct. 20, 1992.
 
 Karen Pope Greenway (argued), Steve Alexander, Arens & Alexander, Fayetteville, Ark., Patrick F. Daly, Palos Heights, Ill., for plaintiffs-appellants.
 Garrett B. Johnson (argued), Mark D. Young, Robert S. Steigerwald, Sara Rollins Slaughter, Kirkland & Ellis, Chicago, Ill., for defendant-appellee Bd. of Trade of the City of Chicago.
 Garrett B. Johnson, Mark D. Young, Robert S. Steigerwald, Sara Rollins Slaughter, Kirkland and Ellis, Scott E. Early, Chicago, Ill., for defendants-appellees Patrick Arbor, Donald G. Andrew, John F. Benjamin, Gary K. Blelfeldt, David P. Brennan, John J. Brogan, Thomas R. Donovan, Lawrence C. Dorf, Burton J. Gutterman, Hal T. Hansen, Glen P. Hollander, Bruce H. Johnson, Dale E. Lorenzen, Karsten Mahlman, Silas Matthies, Sr., John W. Meriwether, Lester Mouscher, Jay C. Nolan, Thomas C. O'Halleran, Irwin N. Smith, Carl M. Zapffe, Charles P. Carey, J. Robert Collins and Philip G. Hubbard.
 James T. Kelly, Pat G. Nicolette, David R. Merrill, Susan Nathan, Commodity Futures Trading Com'n, Joanne T. Medero (argued), Commodity Futures Trading Com'n, Office of the Gen. Counsel, Washington, D.C., for amicus curiae Commodity Futures Trading Com'n.
 Robert B. Nicholson, Robert J. Wiggers, Dept. of Justice, Antitrust Div., Appellate Section, Washington, D.C., for amicus curiae U.S.
 Before FLAUM and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 FLAUM, Circuit Judge.
 
 
 1
 The American Agriculture Movement, a national organization representing the interests of farmers, along with several of its soybean-farmer members (collectively "AAM"), brought this suit against the Chicago Board of Trade and 26 of its officers and employees (collectively "CBOT") under the Commodity Exchange Act (CEA), the Sherman Anti-trust Act and state common law. The district court granted the CBOT's motion to dismiss the CEA count on the ground that the AAM lacked statutory standing. American Agric. Movement, Inc. v. Board of Trade, 1990 WL 71025, 1990 U.S.Dist. LEXIS 4970 (N.D.Ill. April 23, 1990) [AAM I ]. The court subsequently granted the CBOT's motion for summary judgment on the remaining counts, reasoning that the CEA preempted the AAM's common law claims, and had impliedly repealed the Sherman Act under the circumstances of this case. American Agric. Movement, Inc. v. Board of Trade, 770 F.Supp. 407 (N.D.Ill.1991) [AAM II ]. The AAM appeals both decisions. We affirm as to the CEA and common law counts, but reverse the court's entry of summary judgment on the antitrust count, and remand for further proceedings.
 
 I.
 
 2
 The CEA governs the trading of commodity futures contracts, and grants to the Commodity Futures Trading Commission (CFTC or Commission) the authority, in large measure, to implement the regulatory regime established therein. The Commission, pursuant to that authority, see CEA § 5, 7 U.S.C. § 7, has designated the CBOT as a "contract market" on which investors may trade various commodity futures contracts. See generally Chicago Mercantile Exch. v. SEC, 883 F.2d 537, 542-43 (7th Cir.1989) (discussing futures contract trading), cert. denied, 496 U.S. 936, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990); Leist v. Simplot, 638 F.2d 283, 286-87 (2d Cir.1980) (same), aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); William F. Sharpe & Gordon J. Alexander, Investments, ch. 5, at 594-628 (4th ed. 1990) (same). The CBOT's status as a contract market imposes upon it a duty of self-regulation, subject to the Commission's oversight. As part of its duties, the CBOT must enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances. CEA § 5(d), 7 U.S.C. § 7(d). In performing this particular self-regulatory function, the CBOT is required to monitor "market activity for indications of possible congestion or other market situations conducive to possible price distortion." 17 C.F.R. § 1.51(a)(1).
 
 
 3
 This case involves an emergency action taken by the CBOT in response to what it claims was the threat of such a distortion. In the summer of 1989, Ferruzzi Finanziaria, S.p.A., and others (Ferruzzi Group or Ferruzzi) attempted to execute a "squeeze" in the July 1989 soybean futures market. The CBOT's Business Conduct Committee (Committee), the body charged with monitoring the soybean futures markets, determined that the Ferruzzi Group held an unusually large, and dangerous, market position; it controlled nearly 60 percent of the long open interests in the futures market, as well as over 60 percent of the cash soybeans in deliverable locations. Moreover, Ferruzzi's futures position was more than four times larger than the deliverable soybean stocks available to other cash market participants. If Ferruzzi did not substantially liquidate its position prior to the delivery date of the July 1989 contracts, the stability of the soybean futures and cash markets could have been seriously compromised.
 
 
 4
 In late June and early July, the Committee repeatedly urged the Ferruzzi Group to reduce in an orderly manner its outstanding open futures position. Ferruzzi stonewalled and declared that it would maintain its position, and in response the Committee, on July 10, recommended that the CBOT's governing board (Board) take emergency action. The following day, the Board, by a 16 to 1 vote, issued an "Emergency Resolution" (Resolution) pursuant to its self-regulatory powers. See CEA § 5a(12), 7 U.S.C. § 7a(12). The Resolution declared a market emergency, and ordered any person or group controlling gross long or short positions in excess of three million bushels to liquidate their positions by at least 20 percent daily. In addition, it ordered that no person or group could own contracts in excess of three million bushels on July 18, or in excess of one million bushels on July 20, the last trading day for July 1989 contracts. The Board, pursuant to CBOT Rule 180.00, immediately made the Resolution public, and, pursuant to CEA § 5a(12), informed the Commission of its action.
 
 
 5
 Not surprisingly, publication of the Resolution led to a price decline in the July 1989 futures market, a decline that worked to the benefit of open shorts and the detriment of open longs. The AAM alleges that the Resolution also caused a proportionate decline in the cash market--an allegation over which there is some dispute, see Letter from Wendy L. Gramm [CFTC Chairperson] to Senator Patrick Leahy, at 28-30 (Aug. 25, 1989) (hereinafter "Gramm Letter"), but which we must accept at this juncture as true--to the detriment of farmers, who sell soybeans in that market. The AAM further alleges that the CBOT was motivated by something other than a desire to prevent distortions in the soybean futures market; it accuses the Committee and the Board of bad faith in recommending and adopting the Resolution. Although no member of either body held individual short positions in the futures market, two participating Committee members, and several Board members who voted in favor of the Resolution, were affiliated with firms that did. Moreover, according to the AAM, some of those firms needed, or had clients that needed, cash soybeans, and hence benefitted from a reduction in price in the cash market. The Resolution, the allegations continue, was the product of a conspiracy among the individual defendants, the firms with which some of the defendants were affiliated, and those firms' clients, to depress prices in both the cash and futures markets.
 
 
 6
 After receiving notice of the CBOT's adoption of the Resolution, the Commission took no formal action; it neither overturned nor approved the Resolution. Commission staff members did, however, conduct an informal investigation, and concluded that the Board acted reasonably and in good faith. Shortly thereafter, the AAM filed suit against the CBOT, five Committee members, and twenty-one Board members for recommending, adopting and publishing the Resolution, seeking redress under § 5 of the CEA, the Sherman Act, and state common law.
 
 II.
 
 7
 Section 5 of the CEA, 7 U.S.C. § 7, authorizes the Commission to designate as a "contract market" any futures exchange that satisfies several enumerated conditions. The condition most relevant here requires a market's governing board to provide for "the prevention of manipulation of prices and the cornering of any commodity by the dealers or operators upon such boards." Id. § 7(d). The AAM contends that the CBOT, in adopting and publishing the Resolution, violated its duty to prevent price manipulation in the July 1989 soybean futures market, and further that § 5 grants it an implied private right of action to remedy the harm it suffered as a result of that violation. On the CBOT's motion to dismiss, the district court ruled that the AAM was foreclosed from seeking a private remedy under the CEA because it had not engaged in futures transactions on the CBOT. AAM I, slip op. at 8-9. The Commission, as amicus, urges us to affirm.
 
 
 8
 We accept for the sake of argument AAM's allegation that the CBOT violated its duty (if indeed one exists) under CEA § 5(d), and consider only the district court's ruling on the implied remedy issue. To support its position, the AAM relies upon Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), which held that the CEA granted futures investors an implied private right of action against futures exchanges that fail, in violation of CEA § 5a(8), 7 U.S.C. § 7a(8), to enforce their own rules against price manipulation. Congress did not expressly provide for a private remedy against such violations when it enacted the CEA in 1922, or when it substantially revised the statute over 50 years later with the Commodity Futures Trading Commission Act of 1974 (the 1974 Act). Prior to 1974, however, federal courts interpreting the CEA had "routinely and consistently" implied private remedies of the variety pursued by the Curran plaintiffs. Id. at 379, 102 S.Ct. at 1839-40. The Court reasoned that Congress' silence in the 1974 Act on the issue of private remedies demonstrated its intent to preserve those particular implied remedies. Id. at 381-82, 102 S.Ct. at 1840-41. Put another way, in light of the case law backdrop of the 1974 Act, if Congress had intended to foreclose such private remedies, it would have told the courts to stop implying them. See Bosco v. Serhant, 836 F.2d 271, 275-76 (7th Cir.1987).
 
 
 9
 The AAM contends that Curran governs this case, for prior to 1974 the courts had recognized implied remedies under the CEA of the sort it seeks here. We put to one side our doubts regarding the AAM's assessment of the pre-1974 case law. Even assuming that its assessment is correct, and consequently that the 1974 Act granted nontraders an implied private right of action against an exchange for violating CEA § 5(d), Congress extinguished it by enacting CEA § 22 as part of a subsequent overhaul of the commodity futures trading laws. See Futures Trading Act of 1982, Pub.L. 97-444, § 235, 96 Stat. 2294, 2322-24 (Jan. 11, 1983) (codified at 7 U.S.C. § 25 (1988)).
 
 
 10
 Section 22 represents Congress' first attempt to explicitly enumerate the private rights of action available to redress violations of the CEA or internal commodity exchange rules. Section 22(a), not at issue here, lists among other things the private remedies available against persons other than contract markets. 7 U.S.C. § 25(a). Section 22(b) creates private remedies against contract markets and their officials, but only on behalf of individuals "who engaged in ... transaction[s] on or subject to the rules of" a contract market. Id. § 25(b)(1)-(3).[1] Subsection 22(b)(5) provides that the private rights of action against the exchanges enumerated in § 22(b) "shall be the exclusive remedy ... available to any person who sustains a loss as a result of" a violation of the CEA or an exchange rule by a contract market or one of its officers or employees. Id. § 25(b)(5) (emphasis supplied). By "any person," we must presume that Congress meant any person, including those who did not engage in futures transactions. By its terms, then, § 22(b) creates the exclusive remedies available to those injured by violations of the CEA, and makes those remedies available only to persons injured in the course of trading on a contract market. It therefore forecloses all other remedies, including any on behalf of non-traders. To the extent (if any) that pre-1974 courts had implied private remedies against exchanges in favor of non-traders, Congress directed them to stop doing so in § 22(b). See Bosco, 836 F.2d at 275-76.
 
 
 11
 The legislative history of the Future Trading Act of 1982 confirms this conclusion. Congress enacted that statute in the wake of Curran, which left unresolved the extent to which courts would recognize implied remedies under the CEA, and which virtually invited Congress to take action. See Curran, 456 U.S. at 394-95, 102 S.Ct. at 1847-48. ("As has been the case with the Rule 10b-5 action, unless and until Congress acts, the federal courts must fill in the interstices of the implied cause of action under the CEA.") (footnote omitted). The legislative history demonstrates that Congress intended to respond to Curran and resolve questions the Court left open. See 128 Cong.Rec. H9964 (daily ed. Dec. 16, 1982) (statement of Rep. de la Garza); id. at H7490 (daily ed. Sept. 23, 1982) (statement of Rep. Glickman). In particular, it manifests Congress' desire "to avoid suits for speculative damages to assets that are affected by fluctuations in prices on the commodity market but which are not the subject of transactions on such market," H.R.Rep. No. 565, Part I, 97th Cong., 2d Sess. 57 (1982), reprinted in 1982 U.S.C.C.A.N. 3871, 3906--precisely the type of suit brought by the AAM.
 
 
 12
 We therefore hold that the district court properly dismissed the CEA count. Even if the statute, at one time, granted non-traders an implied private right action to remedy a contract market's violation of § 5, but see Sam Wong & Son, Inc. v. New York Mercantile Exch., 735 F.2d 653, 667-69 & nn. 24, 26 (2d Cir.1984) (casting doubt upon proposition), Congress' enactment of CEA § 22 in the Futures Trading Act of 1982 eliminated it.
 
 III.
 
 13
 We proceed to the counts brought for common law breach of fiduciary duty and negligence. The AAM lays out those counts rather sparsely in its complaint; it even neglected to specify which state's law was applicable. The district court did not touch upon these matters, and instead ruled that the common law counts were preempted by the CEA. AAM II, 770 F.Supp. at 415-16. The Commission, as amicus, appeared to challenge the district court's ruling in its brief, but shifted gears at oral argument, asking that we affirm, albeit on more narrow grounds.
 
 A.
 
 14
 We first outline some general principles. The supremacy clause grants Congress the power to preempt state law, U.S. Const. art. VI, cl. 2, and in determining whether a federal statute has done so, our ultimate task is to ascertain the intent of Congress. Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95, 103 S.Ct. 2890, 2898-99, 77 L.Ed.2d 490 (1983). There appear to be three variants of federal preemption, one express and two implied. Express preemption naturally requires that a statute expressly define the scope of its preemptive effect. Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 203, 103 S.Ct. 1713, 1721-22, 75 L.Ed.2d 752 (1983). The second variant, field preemption, occurs where Congress manifests an intent to exclusively occupy an entire field of regulation; one can infer that intent, for example, from a federal regulatory scheme that is "so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it." Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (internal quotation omitted). The third variant, conflict preemption, occurs either where it is impossible to comply with both federal and state law, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217-18, 10 L.Ed.2d 248 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as manifested in the language, structure and underlying goals of the federal statute at issue. Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Only if a statute is devoid of explicit preemptive language may we resort to either variant of implied preemption. Cipollone v. Liggett Group, Inc., --- U.S. ----, ----, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992) (plurality); id., --- U.S. at ----, 112 S.Ct. at 2625 (Blackmun, J., concurring).[2]
 
 B.
 
 15
 No one suggests that the CEA expressly preempts state law, or that it is impossible to comply with both state and federal law, so we need only address whether the statute erects field preemption or the second type of conflict preemption. The statutory text is not dispositive on these questions. The CBOT contends that conflict preemption bars the AAM's common law claims because permitting state claims on behalf of non-traders would undermine the purposes behind CEA § 22(b). That provision, as discussed above, limits the availability of private rights of action against exchanges (and their officers and employees) under the CEA to those who have engaged in futures trading. The supposed conflict arises because " 'Congress cannot have intended to place such a restriction on lawsuits against contract markets ... but at the same time leave them subject to liability under a common law theory.' " Def.'s Br. at 39 (quoting AAM II, 770 F.Supp. at 416). This argument rests upon a less than careful reading of the statute. Section 22(b), by its terms, provides that "[t]he rights of action authorized by this subsection shall be the exclusive remedy under this chapter available to any person who sustains a loss" as a result of an exchange's action. 7 U.S.C. § 25(b) (emphasis added). Were the emphasized qualifier left out, the CBOT might well have a point. Its presence, however, indicates that the exclusivity provision extends only to private actions seeking redress under the CEA, and does not curtail actions brought under other federal laws or state law. Consequently, any argument for preemption must rest upon a source other than § 22(b).
 
 
 16
 Two other CEA provisions are helpful, but only to a limited extent. The first provides that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." 7 U.S.C. § 2 (emphasis added). The cases, see, e.g., Kerr v. First Commodity Corp., 735 F.2d 281, 288 (8th Cir.1984); Taylor v. Bear Stearns & Co., 572 F.Supp. 667, 673 (N.D.Ga.1983); Patry v. Rosenthal & Co., 534 F.Supp. 545, 548-49 (D.Kan.1982), have read this provision as a "savings clause" designed to preserve in the futures trading context at least some state law causes of actions, an assessment with which we agree. The savings clause resolves one of the two questions we posed above; it tells us that Congress did not intend to preempt the field of futures trading. See International Paper Co. v. Ouellette, 479 U.S. 481, 492, 107 S.Ct. 805, 811-12, 93 L.Ed.2d 883 (1987); Michigan Canners & Freezers Ass'n v. Agric. Mktg. and Bargaining Bd., 467 U.S. 461, 471-74, 104 S.Ct. 2518, 2524-26, 81 L.Ed.2d 399 (1984).
 
 
 17
 Nonetheless, the clause leaves open the possibility of conflict preemption. We therefore turn to another clause contained in the same section of the CEA, one which coexists somewhat uneasily with the savings clause. That clause provides that "the Commission shall have exclusive jurisdiction ... with respect to accounts, agreements ..., and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market...." 7 U.S.C. § 2 (emphasis added). Standing alone, this would appear to grant exclusive authority to the Commission over cases involving futures contracts, and to completely preempt state law as a result. However, it cannot do so if the savings clause is to retain any meaning, which of course it must. Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 613, 93 S.Ct. 2469, 2475, 37 L.Ed.2d 207 (1973). Giving full effect to both clauses compels the conclusion that Congress intended to preempt some, but not all, state laws that bear upon the various aspects of commodity futures trading.
 
 
 18
 Because the CEA's text provides no clue as to how this line should be drawn, we must take our guidance from the goals and policies underlying the statute. International Paper, 479 U.S. at 493, 107 S.Ct. at 812. That same consideration directs our attention to the statute's structure and legislative history. See California Fed. Sav. and Loan Ass'n v. Guerra, 479 U.S. 272, 286-88, 107 S.Ct. 683, 692-93, 93 L.Ed.2d 613 (1987); Michigan Canners, 467 U.S. at 471-74, 104 S.Ct. at 2524-26.[3] As others have observed, the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." H.R.Rep. No. 975, 93d Cong., 2d Sess. 1 (hereinafter "House Report") (quoted in Curran, 456 U.S. at 356, 102 S.Ct. at 1828). Congress originally enacted the CEA over 60 years ago, but the statute in its modern, more robust form was born primarily of the 1974 Act. See Curran, 456 U.S. at 360-67, 102 S.Ct. at 1830-34 (discussing history of CEA). The 1974 Act broadened the CEA's coverage, increased penalties for the violation of its provisions, and, most important, created the Commission as an independent federal regulatory agency, granting it broad powers to administer and enforce the CEA.
 
 
 19
 The circumstances surrounding passage of the 1974 Act shed a great deal of light upon the preemptive scope of the CEA. It appears that a confluence of events in the early 1970s--including a drastic surge in commodities trading, rapidly rising food costs, and a highly publicized and costly futures trading scandal--led Congress to modernize and fortify the CEA and fill some fairly significant regulatory gaps. See Kevin T. Van Wart, Preemption and the Commodity Exchange Act, 58 Chi.-Kent L.Rev. 657, 672-76 (1982); Philip F. Johnson, The Commodity Futures Trading Commission Act: Preemption as Public Policy, 29 Vand.L.Rev. 1, 2-5 (1976). The Act's proponents were concerned that the states, in light of these circumstances, might step in to regulate the futures markets themselves. This, they feared, might have subjected the national futures trading apparatus to conflicting regulatory demands. See, e.g., Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry, 93d Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark) ("different State laws would just lead to total chaos"). The solution, the House Committee on Agriculture believed, was to put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." House Report at 76; see also Graham Purcell & Abelardo Lopez Valdez, The Commodity Futures Trading Commission Act of 1974: Regulatory Legislation for Commodity Futures Trading in a Market-Oriented Economy, 21 S.D.L.Rev. 555, 573-74 (1976). The Senate Committee on Agriculture and Forestry apparently concurred, as indicated by its deletion of a CEA provision which appeared to preserve the states' authority over futures trading. See Van Wart, supra, at 687-88; see also 120 Cong.Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge).
 
 
 20
 Accordingly, permitting the AAM to bring its state law claims against the CBOT would frustrate Congress' intent to bring the markets under a uniform set of regulations. This conclusion might appear at first blush to run against the grain of a number of cases holding that the CEA does not preempt common law negligence, fraud and breach of fiduciary duty suits brought by futures investors against their brokers. See, e.g., Kerr, 735 F.2d at 288; Kotz v. Bache Halsey Stuart, Inc., 685 F.2d 1204, 1207-08 (9th Cir.1982); Sall v. G.H. Miller & Co., 612 F.Supp. 1499, 1504 (D.Colo.1985); Poplar Grove Planting & Ref. Co., Inc. v. Bache Halsey Stuart Inc., 465 F.Supp. 585, 592 (M.D.La.1979); see generally Eliot J. Katz, Annotation, Commodities Broker's State-Law Duties to Customers, 55 A.L.R.4th 394, 416-24 (1987) (discussing case law). However, these cases are distinguishable from the case before us on one critical ground: they have little or no bearing upon the actual operation of the commodity futures markets. Only in the context of market regulation does the need arise for uniform legal rules. As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors (or farmers). See Paine, Webber, Jackson & Curtis, Inc. v. Conaway, 515 F.Supp. 202, 204-07 (N.D.Ala.1981) (CEA preempts state law voiding futures transactions in which actual delivery of the commodity is not intended), disapproved on other grounds, Messer v. E.F. Hutton & Co., 847 F.2d 673 (11th Cir.1988); Van Wart, supra, at 677-79. In contrast, there is no need for uniformity when it comes to the rules that govern principal-agent relationships between brokers and investors. For example, the possibility that different states would impose dissimilar fiduciary duties upon brokers might affect those private relationships, but would not appreciably hamper the efficient operation of the futures market.
 
 
 21
 In sum, the structure and history of the CEA indicate that the propriety of conflict preemption depends upon the particular context in which a plaintiff seeks to bring a state law action. When application of state law would directly affect trading on or the operation of a futures market, it would stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines, 312 U.S. at 67, 61 S.Ct. at 404, and hence is preempted. When, in contrast, the application of state law would affect only the relationship between brokers and investors or other individuals involved in the market, preemption is not mandated. See Bernstein v. Lind-Waldock & Co., 738 F.2d 179, 184-85 (7th Cir.1984) (dispute between seat owner and clearing member of an exchange not governed by the CEA). This distinction was recognized during hearings on the 1974 Act, see Senate Hearings at 663-64, and has been relied upon by at least one court. See Poplar Grove, 465 F.Supp. at 592. Accordingly, the AAM's state law claims against the CBOT for implementing the emergency Resolution are preempted by the CEA because they are intimately tied to the operation of a contract market.
 
 
 22
 Having so held, we acknowledge that most courts have drawn the line between preempted and surviving claims in a slightly different manner. Specifically, they appear to have distinguished state laws which by their terms purport to regulate the futures markets from state laws of general application, such as common law negligence, fraud or breach of fiduciary duty, which do not. See, e.g., Kotz, 685 F.2d at 1207-08; Sall, 612 F.Supp. at 1504-05; Taylor, 572 F.Supp. at 674; Patry, 534 F.Supp. at 549; see also Purcell & Valdez, supra, at 575. Such a regime preempts only the former, and hence, as applied to the case before us, would appear to let stand the AAM's counts for negligence and breach of fiduciary duty.
 
 
 23
 While recognizing the advantages of bright-line rules, see generally Antonin Scalia, The Rule of Law as a Law of Rules, 56 U.Chi.L.Rev. 1175 (1989), we respectfully decline to follow the approach adopted by those courts, for in our view it elevates form over substance. The distinction drawn here, we suggest, more closely tracks both the intent of Congress in the 1974 Act, and the policies underlying the CEA as a whole. The reason is plain: a law of general application, when applied in a manner that would govern or supervise the operation of or trading on a contract market, raises the same unwelcome specter of non-uniformity as does a law that, by its terms, purports to govern or supervise the same. The crucial inquiry, we reiterate, is the context in which a law is applied. State laws specifically directed towards the futures markets naturally operate in an arena preempted by the CEA. Laws of general application of course operate in a variety of arenas, and are preempted only when plaintiffs attempt to use them in a manner that would, in effect, regulate the futures markets.
 
 IV.
 
 24
 Finally, we turn to the AAM's allegation that the CBOT, by adopting and publishing the Resolution, illegally restrained trade in violation of the Sherman Act. To briefly review ground already covered, the Resolution ordered the Ferruzzi Group to substantially liquidate its open long positions in the July 1989 soybean futures market. Upon adoption and publication of the Resolution, prices in the futures and cash markets plummeted; this price movement benefitted shorts at the expense of longs in the futures market, and benefitted buyers at the expense of sellers in the cash market. The AAM alleges that the CBOT, through the Committee and Board, acted with the intent to benefit the firms with which several individual Committee and Board members were affiliated, as well clients of some of those firms. The district court disposed of the antitrust count on summary judgment, reasoning that the CEA had impliedly repealed the Sherman Act under the facts of this case. AAM II, 770 F.Supp. at 415. The Commission, as amicus, urges us to affirm, while the United States, which at our request submitted an amicus brief on the antitrust issue after oral argument, urges us to reverse.
 
 A.
 
 25
 Once again, we begin by outlining some general principles. The Resolution no doubt restrained trade in the July 1989 soybean futures market, and for that reason would ordinarily fall within the purview of the antitrust laws. But this case is not ordinary, for here the CBOT was also subject to the dictates of the CEA and the regulatory regime established thereunder. That regime imposes upon the CBOT a duty of self-regulation, and upon the Commission the duty to oversee the CBOT's self-regulatory activities, and grants both a certain degree of flexibility when it comes to making judgment calls regarding the efficient operation and maintenance of the futures markets. Conflicts between antitrust law and the CEA, supposed or actual, are inevitable, as exchange activities that would be considered inappropriate under the antitrust laws might arguably be justified, or even required, under the CEA. Ricci v. Chicago Mercantile Exch., 409 U.S. 289, 299-300, 306, 93 S.Ct. 573, 579-80, 582-83, 34 L.Ed.2d 525 (1973). The problem, then, arises "from the need to reconcile pursuit of the antitrust aim of eliminating restraints on competition with the effective operation of a public policy contemplating that [commodity] exchanges will engage in self-regulation which may well have anticompetitive effects in general and in specific application." Silver v. New York Stock Exch., 373 U.S. 341, 349, 83 S.Ct. 1246, 1252-53, 10 L.Ed.2d 389 (1963).
 
 
 26
 Under certain circumstances, reconciling antitrust law with a regulatory regime compels the conclusion that Congress intended the latter to oust the former--that is, compels the conclusion that the regulatory regime has impliedly granted antitrust immunity to private parties operating under its rubric. See, e.g., United States v. National Ass'n of Sec. Dealers, Inc., 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) ["NASD "]; Gordon v. New York Stock Exch., Inc., 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975). Those circumstances, however, are rare. "Implied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between the anti-trust laws and the regulatory system." National Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross, 452 U.S. 378, 388, 101 S.Ct. 2415, 2422, 69 L.Ed.2d 89 (1981) (quotation omitted). We must reconcile operation of the two statutory schemes whenever, and to the greatest extent, possible, Gordon, 422 U.S. at 683, 95 S.Ct. at 2611-12, and accordingly may find that the CEA has impliedly repealed the antitrust laws only if doing so is "necessary to make the [CEA] work, and even then only to the minimum extent necessary." Silver, 373 U.S. at 357, 83 S.Ct. at 1257. As with all matters of statutory construction, the intent of Congress governs, but in order to find implied immunity that intent must be clear. National Gerimedical, 452 U.S. at 389, 101 S.Ct. at 2422.
 
 
 27
 There are, as a general matter, two variants of implied repealer. The first arises when a federal regulatory scheme is so pervasive that "agency initiative or full deliberation controls every aspect of" the defendant's behavior, Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law p 223.2, at 223 (Supp.1991), or where "Congress must be assumed to have foresworn the paradigm of competition." MCI Communications Corp. v. American Tel. and Tel. Co., 708 F.2d 1081, 1102 (7th Cir.) (quotations omitted), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); see also Gordon, 422 U.S. at 688-89, 95 S.Ct. at 2614-15. In the latter context, a court may recognize pervasive repealer even where an agency has not exercised its oversight powers over the challenged practice. See NASD, supra. The second variant is more narrow in scope, and focuses on the extent to which an administrative agency has actually exercised its supervisory powers over the particular practices at issue. Areeda & Hovenkamp, Antitrust Law, supra, p 223.1, at 221. Specifically, this type of implied repealer immunizes from antitrust attack activities that were (1) required by law or the relevant agency, or (2) scrutinized and approved by the agency. Gordon, 422 U.S. at 689, 95 S.Ct. at 2614-15; In re Wheat Rail Freight Antitrust Litig., 759 F.2d 1305, 1312-13 (7th Cir.1985), cert. denied, 476 U.S. 1158, 106 S.Ct. 2275, 90 L.Ed.2d 718 (1986); MCI Communications, 708 F.2d at 1102. An agency's scrutiny and approval supports antitrust immunity only if it has "perform[ed] the antitrust function of insuring that an exchange" has not taken action that harms competition in a manner not "justified as furthering self-regulative ends." Silver, 373 U.S. at 358, 83 S.Ct. at 1258. Even then, immunity may be appropriate only if the agency's approval is subject to "ensuing judicial review" in the courts. Id. at 358 n. 12, 83 S.Ct. at 1257 n. 12; see also Gordon, 422 U.S. at 684-85, 690 & n. 15, 95 S.Ct. at 2612-13, 2615 & n. 15; Ricci, 409 U.S. at 306, 93 S.Ct. at 582-83.
 
 B.
 
 28
 With these precepts in mind, we outline, in some detail, the regulatory environment in which the CBOT adopted, implemented and published the Resolution. As noted, self-regulating contract markets designated under CEA § 5 are required to adopt rules "for the prevention of the manipulation of prices and the cornering of any commodity." CEA § 5(d), 7 U.S.C. § 7(d). As a general matter, a market must gain the Commission's approval prior to implementing exchange rules of this nature, and the statute outlines the procedures under which the Commission may approve or disapprove such rules. CEA § 5a(12), id. § 7a(12); see also 17 C.F.R. § 1.41(b); Philip M. Johnson & Thomas L. Hazen, I Commodities Regulation § 2.56, at 366-67 (2d ed. 1989).[4] The statute nonetheless carves an exception for "emergencies"[5] requiring immediate action. Under such circumstances, an exchange, by a two-thirds vote of its governing board, may adopt and immediately implement a temporary emergency rule without prior Commission approval. CEA § 5a(12), 7 U.S.C. § 7a(12); 17 C.F.R. § 1.41(f); see also Johnson & Hazen, I Commodities Regulation, supra, § 2.62, at 376. In lieu of prior approval, the exchange must notify and provide the Commission with a complete explanation of both the emergency and the action it took in response. CEA § 5a(12); 7 U.S.C. § 7a(12).
 
 
 29
 Neither the statute nor the applicable regulations explicitly provide for Commission review of temporary emergency rules. See id.; 17 C.F.R. § 1.41(f). Nonetheless, the Commission believes, see CFTC Interpretive Letter No. 79-2 (Standard of Review of Temporary Emergency Rules Adopted by Contract Markets), [1977-1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) p 20,860 (July 25, 1979), and the Second Circuit has apparently agreed, see Sam Wong, 735 F.2d at 664, that CEA § 8a(9) empowers the Commission to overturn, modify or approve a rule after receiving notification from an exchange. See also 41 Fed.Reg. 40096 n. 13 (Sept. 17, 1976) (background to 17 C.F.R. § 1.41(f)) (section 1.41(f) "should not be interpreted ... to imply that actions taken by a contract market in an emergency are not subject to subsequent Commission review of a comprehensive nature...."). This stance rests upon a logical reading of CEA § 8a(9). That provision empowers the Commission, in the event of an emergency, to direct an exchange to take emergency action that the Commission believes is necessary under the circumstances. The CFTC's and Second Circuit's reading of the statute is logical because if the Commission exercises its § 8a(9) powers after an exchange has adopted a temporary emergency rule, it will have, in effect, overturned, modified or approved the rule. When acting under § 8a(9), the Commission must "take into consideration the public interest to be protected by the antitrust laws and endeavor to take the least anticompetitive means of achieving the objectives of" the CEA. CEA § 15, 7 U.S.C. § 19. It must rest its approval or disapproval upon a determination of whether the rule was reasonable, and whether the exchange adopted it in good faith. CFTC Interpretive Letter, supra, at 25,528; see also Daniel v. Board of Trade, 164 F.2d 815, 819-20 (7th Cir.1947). Action taken under § 8a(9) is subject to judicial review in an appellate court, and may be overturned if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 7 U.S.C. § 12a(9).
 
 
 30
 While the Commission has to power to take action under § 8a(9) after receiving an exchange's § 5a(12) notification, it need not do so, and oftentimes "simply [chooses] to refrain from acting." Sam Wong, 735 F.2d at 664. As the Commission sees it, the statute and applicable regulations "were not intended to imply that temporary emergency rules must, at some point in time, be approved or disapproved by the Commission." CFTC Interpretive Letter, supra, at 23,527 n. 3. The Commission has apparently delegated the initial decisionmaking authority over these matters to its Division of Trading and Markets (T & M). If T & M determines that a given temporary emergency rule was reasonable and enacted in good faith, the Commission may decide that further or formal action on its part is unnecessary.
 
 
 31
 That is precisely what happened in this case. The CBOT adopted the Resolution on July 11, 1989, under its § 5a(12) emergency powers, see 17 C.F.R. § 1.41(f)(3)(v) (temporary rule may compel traders to liquidate contracts or reduce their positions), and immediately notified the Commission. On September 7, 1989, T & M reported to the Commission its conclusion that the Resolution complied with all substantive and procedural requirements under the CEA. See Review Under Commission Regulation 1.41(f) of the Chicago Board of Trade's Temporary Emergency Action of July 11, 1989 (Sept. 7, 1989) [hereinafter "T & M Report"]. The following day, a Commission member told the Senate Agriculture Committee that the Commission agreed with the T & M report. The Commission tells us, however, that neither the T & M report nor the subsequent testimony in the Senate constitutes "approval" of the Resolution--at least as the term is employed under CEA § 5a(12) with regard to non-emergency rules approved through the normal channels. CFTC Br. at 10. The Commission took no further action by the time the AAM filed suit on November 14, 1989,[6] and has taken no action since.[7]
 
 C.
 
 32
 Having examined the CEA's regulatory structure and the Commission's actions in this case, we return to the principles of implied antitrust immunity. The CBOT maintains that both variants of implied immunity, see pp. 1158-1159 supra, govern this case, and we consider each in turn.
 
 1.
 
 33
 We can dispatch rather quickly with the CBOT's argument--echoing that made by the Commission, as amicus--that the CEA bestows "pervasive" implied immunity upon contract markets. At the outset, it is important to recognize that Congress did not intend the CEA to extend blanket immunity to the exchanges for their adoption and enforcement of exchange rules, emergency or otherwise. The Supreme Court, in 1973, recognized that the CEA did not "confer general antitrust immunity" on the exchanges and their members for conduct taken pursuant to a Commission regulation or exchange rule. Ricci, 409 U.S. at 302 n. 13, 93 S.Ct. at 580 n. 13. Shortly thereafter, during deliberations on the 1974 Act, the House Agriculture Committee considered and rejected a provision that would have shielded from antitrust attack any conduct of that nature. See House Report, supra, at 23-28; Philip F. Johnson, Antitrust in the Commodities Field: After Gordon, 6 Hofstra L.Rev. 115, 120-21 (1977). Instead, Congress enacted CEA § 15, which directs the Commission to take antitrust policy into consideration when performing its regulatory functions. 7 U.S.C. § 19. It appears as if the Committee accepted the view, expressed at the time by the Department of Justice, that existing principles of implied antitrust immunity, as developed in Silver, and would suffice to shield the exchanges from antitrust attack under the appropriate circumstances. See House Report, supra, at 27-28; Johnson, supra, at 123.
 
 
 34
 Congress' clear rejection of blanket immunity casts serious doubt upon the CBOT's contention that the Commission's regulation of exchange emergency actions under CEA § 5a(12) is so "pervasive" as to demand antitrust immunity. See National Gerimedical, 452 U.S. at 391-93, 101 S.Ct. at 2423-24 (absence of blanket immunity leads Court to reject "pervasive" repeal). The legislative history of the 1974 Act demonstrates that Congress intended to leave federal courts with at least some authority over exchange practices; this, in turn, strongly suggests that it did not "vest[ ] in the [Commission] final authority to determine whether and to what extent" facially anticompetitive practices should be tolerated under the CEA. NASD, 422 U.S. at 729, 95 S.Ct. at 2447. Moreover, the inclusion of anti-price manipulation provisions in the CEA, see, e.g., 7 U.S.C. § 7(d), provisions that apply to the exchanges themselves, indicate that Congress has not "foresworn the paradigm of competition" in this field. MCI Communications, 708 F.2d at 1102. In sum, the indicia of "pervasive" regulatory schemes are not present in this case. See Strobl v. New York Mercantile Exch., 768 F.2d 22, 27-28 (2d Cir.), cert. denied, 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985).[8]
 
 2.
 
 35
 In the absence of a pervasive regulatory scheme, we may imply antitrust immunity in either one of two circumstances: first, where the challenged action was compelled by a statute, regulation, or agency, and, second, where the action was "scrutin[ized] and approv[ed]" by the appropriate agency. National Gerimedical, 452 U.S. at 389, 101 S.Ct. at 2422. Had the Commission, pursuant to its § 8a(9) powers, ordered the CBOT to take emergency action in response to the impending Ferruzzi squeeze, or had it modified the action the CBOT took on its own, there can be no doubt as to the outcome of this case. Exposing the CBOT to potential antitrust liability under such circumstances would subject it to conflicting standards, leading to the inevitable conclusion that Congress intended to grant antitrust immunity. Gordon, 422 U.S. at 688-89, 95 S.Ct. at 2614-15. But the Commission did not compel the CBOT to do anything, so implied repealer cannot rest upon this ground.[9]
 
 
 36
 We must determine, then, whether the Commission's performance after receiving notification from the CBOT constitutes "scrutiny and approval" sufficient to warrant antitrust immunity. Silver and Gordon, the two cases most relevant here, provide a useful starting point. In Silver, the New York Stock Exchange (NYSE), pursuant to one of its own rules, ordered some members to eliminate private direct telephone connections with the offices of nonmembers. The members brought suit under the Sherman Act, and the NYSE defended by claiming immunity under § 19(b) of the Securities Exchange Act of 1934. That provision granted the Securities and Exchange Commission (SEC) the power to request that the exchanges modify, and when appropriate to disapprove, exchange rules. It did not, however, give the SEC jurisdiction to review the NYSE's enforcement of its exchange rules in this instance. Silver, 373 U.S. at 357, 83 S.Ct. at 1257 (citations omitted). In weighing the propriety of antitrust immunity, the Court looked to the nature and extent of the SEC's regulatory authority over the challenged NYSE order. The regulatory scheme at issue, it observed, provided "no agency check on" the NYSE's behavior, id. at 359, 83 S.Ct. at 1258, and moreover failed to ensure that some governmental body would "perform[ ] the antitrust function of insuring that an exchange will not in some cases apply its rules so as to do injury to competition" without adequate justification under the securities laws. Id. at 358, 83 S.Ct. at 1258. For these reasons, the Court declined to recognize antitrust immunity. Significantly, however, Silver recognized that the result might have been different "[w]ere there [SEC] jurisdiction and ensuing judicial review" over the particular exchange ruling. Id. at 358 n. 12, 83 S.Ct. at 1257 n. 12; see also id. at 360, 83 S.Ct. at 1258 (immunity might be appropriate if "review of exchange self-regulation [were] provided through a vehicle other than the antitrust laws").
 
 
 37
 Twelve years later, in Gordon, the Court confronted the situation to which it alluded in Silver. Gordon considered an antitrust suit brought by investors challenging exchange rules setting fixed commission rates for brokers. The defendants, like those in Silver, claimed immunity under § 19(b) of the Securities and Exchange Act of 1934, but this time the Court agreed. Section 19(b)(9) authorized the SEC to supervise the exchanges' "fixing of reasonable rates of commission," and empowered it to require exchanges to alter, supplement or scuttle exchange rules concerning those rates. Gordon, 422 U.S. at 685, 95 S.Ct. at 2612-13. The SEC's regulatory authority in this context, the Court recognized, was more potent and intrusive than it had been in Silver. The Court also observed that SEC review of commission rates, in practice, had been active, thorough and subject to judicial review, and further that Congress had approved of the SEC's regulatory practices for a number of years. Id. at 689-91, 95 S.Ct. at 2614-16. In light of the nature and extent of SEC's scrutiny and approval of exchange commission rate, the Court concluded, antitrust immunity was warranted. See id. at 689 n. 13, 95 S.Ct. at 2614 n. 13 (SEC review so intrusive that it had, in effect, issued "an affirmative order to the exchanges to follow fixed rates"). Id. at 689 n. 13, 95 S.Ct. at 2614 n. 13.
 
 
 38
 As one might expect, the AAM contends that this case is analogous to Silver, while the CBOT argues that Gordon is directly on point. The truth falls somewhere in between. At first glance it appears that the CBOT is closer to the mark. The Commission here--like the SEC in Gordon--had the authority under CEA § 8a(9) to review, and conceivably to modify or alter, the Resolution. Compare Gordon, 422 U.S. at 685, 95 S.Ct. at 2612-13 with Silver, 373 U.S. at 357, 83 S.Ct. at 1257 and National Gerimedical, 452 U.S. at 389-90, 101 S.Ct. at 2422-23. Moreover, CEA § 15 required the Commission to take into consideration the policies underlying the antitrust laws when discharging its duties under § 8a(9). 7 U.S.C. § 19; cf. Silver, 373 U.S. at 358, 83 S.Ct. at 1258 (no antitrust immunity where "nothing built into the regulatory scheme which performs the antitrust function"). Finally, the Commission's decision not to take action in light of the T & M report resembles somewhat the regulatory "scrutiny and approval" found in Gordon.
 
 
 39
 But appearances are deceiving. The fact that an agency let stand a practice voluntarily initiated by a regulated entity--even when it had the power to review, modify and overturn that practice--is not sufficient, in and of itself, to confer antitrust immunity. Also pertinent is the nature and degree of the agency supervision at issue. Areeda & Hovenkamp, Antitrust Law, supra, p 223.1, at 221. That is to say, the agencies emit a number of green lights, all of which say "go," but the doctrine recognizes that some green lights shine brighter than others. Cf. FTC v. Ticor Title Ins. Co., --- U.S. ----, ----, 112 S.Ct. 2169, 2177, 119 L.Ed.2d 410 (1992) (Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 state-action antitrust immunity available only if the state has "played a substantial role in determining the specifics of the [allegedly anticompetitive] policy").
 
 
 40
 Gordon is illustrative. The Court's observation that the SEC had the authority to reverse the NYSE's fixed commission rate rules, yet had declined to do so, served only as the starting point of its analysis. The Court went on to laud the SEC's "deep and serious study of" such rules, Gordon, 422 U.S. at 690-91, 95 S.Ct. at 2615; see also id. at 668-77, 95 S.Ct. at 2604-09, and further pointed to Congress' "continued approval" of the SEC's regulatory track record--up to and including the SEC's ultimate ban on fixed rates in 1975--and explicit legislative authorization permitting the SEC to reintroduce fixed rates under certain circumstances. Id. at 690-91, 95 S.Ct. at 2615-16; see also id. at 677-82, 95 S.Ct. at 2609-11. Finally, and most significantly, it explained that the SEC's regulation of commission rates were subject to judicial review under the Administrative Procedure Act, id. at 690 n. 15, 95 S.Ct. at 2615 n. 15, and even suggested that the availability of such review was a prerequisite to immunity. Id. at 684-85, 95 S.Ct. at 2612-13. The confluence of these circumstances led the Court to recognize implied antitrust immunity.
 
 
 41
 While the issue posed is admittedly a close one, we conclude that the regulatory supervision in this case was not sufficient to cloak the Resolution with similar immunity. We begin by repeating two earlier observations: the decision to adopt the Resolution was solely the CBOT's, and the Commission never formally voted on or approved T & M's conclusion that the CBOT's action was lawful. As such, its "approval" of the Resolution was not the product of any affirmative action, but rather of acquiescence, or the failure to take action. The Commission, as amicus, makes much of the fact that CEA § 5a(12) does not require the Commission to approve or disapprove any temporary emergency rule adopted by an exchange. It could have said the same of CEA § 8a(9). But finding that the Commission's conduct did not fall short of its statutory mandate is of marginal relevance to the issue of antitrust immunity. In Silver, for example, the SEC's failure to review the NYSE's enforcement of an exchange rule was entirely lawful--in fact, the statute precluded the SEC from undertaking such a review--but that certainly did not weigh in favor of antitrust immunity. As a leading treatise puts it, the failure of an agency to take formal action "simply cannot be equated with 'an informed administrative judgment,' " and therefore "cannot strengthen the argument for judicial abstention." Phillip Areeda & Donald F. Turner, Antitrust Law p 224, at 152 (1978).
 
 
 42
 In MCI Communications, supra, we declined to find implied antitrust immunity in a situation closely analogous to that here. The case considered MCI's allegations that AT & T had, among other things, engaged in predatory pricing in certain telecommunications service markets. AT & T contended that its pricing practices were shielded from antitrust attack by the Federal Communications Act, which gave the Federal Communications Commission (FCC) the right to conduct hearings on AT & T's proposed rates. In denying implied immunity, we relied upon two factors--factors also present here. First, AT & T, not the FCC, had made the initial decision to adopt the rates at issue; put another way, the decision was " 'governed in the first instance by business judgment and not regulatory coercion.' " MCI Communications, 708 F.2d at 1104 (quoting Otter Tail Power Co. v. United States, 410 U.S. 366, 374, 93 S.Ct. 1022, 1028, 35 L.Ed.2d 359 (1973)). Second, while the FCC had the right to formally review proposed rates, the statute granted it the discretion to take no action whatsoever; if the FCC did not expressly approve such rates after their proposal, they automatically went into effect after 90 days. Id. Implied antitrust immunity was inappropriate in light of the "less than comprehensive nature of the FCC's" supervision over the rate practices at issue, as well as the fact that the practice arose in large part from AT & T's independent judgment. Id. at 1105. As the discussion in Section III.B demonstrates, the present facts are not readily distinguished from those in MCI Communications.
 
 
 43
 We acknowledge that some of the SEC's decisions to "approve" the NYSE's commission rate rules in Gordon were not the product of full-scale adjudications or formal votes. See Gordon, 422 U.S. at 677, 95 S.Ct. at 2609. However, as we explained in MCI Communications, the SEC in Gordon had supervised the NYSE's commission rate practices so closely that its deliberate approval could be inferred even in those particular instances where no formal agency action had been taken. MCI Communications, 708 F.2d at 1103 (citing Gordon ). Here, the "scrutiny and approval" undertaken by the Commission did not rise to that level. We believe the most significant distinction concerns the availability of judicial review in each instance. Gordon and Silver emphasized that such review was an important--and perhaps essential--ingredient to any claim of implied antitrust immunity. Id., 422 U.S. at 684-85, 95 S.Ct. at 2612-13; Silver, 373 U.S. at 358 n. 12, 83 S.Ct. at 1257 n. 12. In Gordon, the Court assumed that disgruntled parties could challenge the SEC's informal approval of exchange commission rate practices in court. Gordon, 422 U.S. at 678 n. 11, 690 n. 15, 95 S.Ct. at 2609 n. 11, 2615 n. 15. Here, in contrast, we agree with the United States, as amicus, that the Commission's action would not have been subject to judicial review.
 
 
 44
 To see why, it is necessary to revisit relevant portions of the CEA. Section 5a(12), recall, requires an exchange to obtain Commission approval before implementing nonemergency exchange rules, and lays out notice and comment procedures the Commission must employ. 7 U.S.C. § 7a(12); note 4 supra. The Commission's approval or disapproval of such rules is presumably subject to judicial review. The same provision, however, does not require Commission approval or disapproval--or even provide for Commission review--of temporary emergency rules. 7 U.S.C. § 7a(12); 17 C.F.R. § 1.41(f); see p. 1159 supra. Only under § 8a(9) may the Commission modify, overturn and approve such rules. 7 U.S.C. § 12a(9); pp. 1159-1160 supra. That provision explicitly provides for judicial review, but only when the Commission takes "action," meaning when it "direct[s] [a] contract market ... to take [emergency] action as in the Commission's judgment is necessary" to maintain orderly trading. 7 U.S.C. § 12a(9). In this case, the Commission did not direct the CBOT to do anything; while it is unclear whether formal approval (i.e., a full Commission vote) have constituted an "action" as the term is employed under § 8a(9), here we do not have even that.
 
 
 45
 Our analysis elicits two significant points. First, the CEA provides the Commission with the discretion to take no formal action when notified that an exchange has adopted a temporary emergency rule. See also 17 C.F.R. § 1.41(f); CFTC Interpretive Letter, supra, at 23,527 n. 3. Second, the Commission exercised its discretion to abstain in this case. Under the standards set forth in Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), that decision is not subject to judicial review. As Chaney teaches, a regulatory agency's decision not to take action is presumptively immune from judicial review. Id. at 832, 105 S.Ct. at 1656. The presumption may be rebutted if the regulatory statute directs the agency to affirmatively exercise its powers, id. at 833, 105 S.Ct. at 1656-57; but the CEA, as we have seen, provides no such direction. Unlike the situation in Gordon, then, the Commission's regulatory response to the Resolution could not have been challenged in the courts.[10]
 
 
 46
 Whether the unavailability of judicial review, in and of itself, is fatal to the CBOT's claim of antitrust immunity we need not decide, see Gordon, 422 U.S. at 678 n. 11, 685-86, 690 n. 15, 95 S.Ct. at 2609 n. 11, 2612-13, 2615 n. 15; Ricci, 409 U.S. at 306, 93 S.Ct. at 582-83; Silver, 373 U.S. at 358 n. 12, 83 S.Ct. at 1257 n. 12, for other considerations also weigh against immunity here. One is the intensity with which the Commission exercised its regulatory powers. The SEC's surveillance of the exchanges' commission rate practices challenged in Gordon appears to have been far more zealous than the Commission's supervision in this case. Gordon examined in (almost excruciating) detail the history of SEC action in that area, Gordon, 422 U.S. at 668-77, 95 S.Ct. at 2604-09, and found that the SEC's prior decisions, both formal and informal, to modify and approve fixed rate practices were made against the backdrop of "deep and serious study," including years of intrusive oversight and compromise. These agency decisions, in other words, reflected more than mere acquiescence.
 
 
 47
 Here, by comparison, the Commission's regulatory supervision was casual and modest in comparison. Although during the pendency of the Ferruzzi crisis Commission staff were in contact with both the CBOT and Ferruzzi, the Commission itself, as its chairperson conceded, "did not play any direct role in the adoption of the [Resolution]." Gramm Letter, supra, at 32. After the fact, T & M conducted an investigation, and concluded that the Board adopted the Resolution in good faith. Specifically, it determined that Board members affiliated with firms holding open short positions had no knowledge of or influence over those positions. T & M Report, supra, at 25-26. We are given, however, absolutely no indication as to the prudence and care with which T & M conducted its investigation. The SEC in Gordon held public hearings, heard testimony from a multitude of witnesses, and justified its conclusions in voluminous and well-reasoned reports. Here, in contrast, no such record was made: it appears that T & M's interviews of the suspect Board members were not conducted in public, and the T & M Report accorded less than a page of rather perfunctory analysis to the allegations of bad faith.[11] The regulatory activities in Gordon, then, were far more active and deliberative than the Commission's activities here.
 
 
 48
 In recognizing implied antitrust immunity, Gordon also emphasized the confidence Congress placed in the SEC's vigorous regulation of commission rates. Gordon, 422 U.S. at 677-82, 95 S.Ct. at 2609-11. Here, we have substantial evidence that Congress is not satisfied with the Commission's scrutiny of temporary emergency rules. Both houses of Congress recently enacted substantial revisions to the CEA. Although the bills have yet to be reconciled in Conference Committee, both contain identical provisions that would amend CEA § 5a(12) to require the Commission to formally approve or disapprove a tendered temporary emergency rule within 10 days of receiving statutory notice from an exchange, and to submit thereafter a report to Congress justifying its approval or disapproval. See Commodity Futures Improvements Act of 1991, H.R. 707, 102d Cong., 1st Sess., § 212 (1991) ("1991 Act"). Notably, the amendment was motivated in large part by dissatisfaction with the Commission's failure to take vigorous action in this very case. The Member who proposed the amendment, during consideration of the House bill, stated:
 
 
 49
 I would like to point out to the membership that the CFTC is the Government watchdog expressly established to monitor the contract market and in my opinion, should be fully involved in certain emergency actions. There should be no doubt that the CFTC is the body charged with ensuring that emergency actions are appropriate.
 
 
 50
 Mr. Chairman, I feel that we all should do what we can to ensure that the CFTC play a more active role in regulating the exchanges, especially in light of the emergency actions involving the July soybean futures contracts.... The existing language [of the bill] enables the CFTC to be the full-fledged oversight partner that it should be.
 
 
 51
 135 Cong.Rec. H5603, H5613 (Sept. 13, 1989) (statement of Rep. Long); see also id. at H5626 (statement of Rep. Tauke); 135 Cong.Rec. S12778, S12780 (Oct. 5, 1989) (Executive Summary of Senate bill). The debates thus far reflect a belief among many Members that the Commission has been too lax in reviewing temporary emergency rules adopted by exchanges under CEA § 5a(12).
 
 
 52
 A separate provision in both bills further reflects Congress' view that the Commission's supervision has been less than adequate. The House version, for example, would add to the CEA a provision requiring members of an exchange's governing board to abstain from voting on an exchange rule if an affiliated firm has a direct financial interest. See 135 Cong.Rec. H5603, H5622 (Sept. 13, 1989). The Member who offered that amendment specifically alluded to the purported conflict of interest underlying the CBOT's passage of the Resolution, and criticized the Commission's view that such conflicts were not a problem:
 
 
 53
 At the time of the Chicago Board of Trade ... decision to force an Italian firm to liquidate a position, we made inquiries as to whether or not any of the members of the Chicago Board of Trade's governing body, their board, in fact had a position on the market that would be directly impacted on [sic] by the decision [and] whether or not any employer of a board member had a position....
 
 
 54
 [D]uring consideration of this legislation it came out that in fact six [CBOT] directors, firms, [and] employers had direct positions in the market that were positively impacted by the rulemaking decision....
 
 
 55
 CFTC has not found anything wrong with that practice in the past, and I say it is wrong.... It is very, very difficult to go out and convince a farmer in Iowa to go out and have confidence in the market if Cargill is voting on rules that affect positively or in fact adversely impact their position....
 
 
 56
 Id. (statement of Rep. Nagle); see also 135 Cong.Rec. S12778, S12779 (Oct. 5, 1989) (discussing similar amendment in Senate bill).
 
 
 57
 Admittedly, the 1991 Act has yet to emerge from Conference Committee, and as such we do not mean to attribute undue significance to either the Act's provisions or their underlying motivations. Nonetheless, this legislative activity, which came shortly off the heels of the Ferruzzi crisis, manifests displeasure in both houses of Congress with the nature and extent of the Commission's supervision over exchange-adopted temporary emergency rules. See Gordon, 422 U.S. at 679-82, 95 S.Ct. at 2609-11 (relying upon legislation enacted in 1975 when challenged practices occurred in 1971). As such, it certainly does not bolster the CBOT's argument for implied antitrust immunity. Cf. id. at 689-91, 95 S.Ct. at 2614-16.
 
 
 58
 In sum, we hold that the CEA does not grant implied antitrust immunity under the circumstances of this case. Silver and Gordon teach that outside the context of a pervasive regulatory scheme, such immunity is proper when the relevant agency's scrutiny and approval of the challenged practice is active, intrusive and appropriately deliberative. Put another way, an antitrust court, before relinquishing jurisdiction over allegedly anticompetitive activities, must be convinced that the agency has exercised its independent judgment in reflecting upon and approving the activity at issue. See id. at 689-91, 95 S.Ct. at 2614-16; cf. Ticor Title, --- U.S. at ----, 112 S.Ct. at 2177. Moreover, the availability of judicial review, even if not the sine qua non of immunity, is extremely important. We do not deny that the CEA and its enabling regulations lay in place a regulatory framework under which the Commission can exercise the requisite degree of supervision. Here, however, the Commission did not utilize that framework. The lack of available judicial review, the Commission's halfhearted and nonpublic review of the challenged practice, and Congress' manifest dissatisfaction with the Commission's performance in this specific case, all point toward a result different from that reached in Gordon. Consequently, the district court erred in granting the CBOT summary judgment on the AAM's antitrust count.
 
 
 59
 Our holding is limited strictly to the issue of implied immunity, and does not in any way portend our view of the legal or factual merits of the AAM's antitrust count. To ultimately prevail, the AAM will have to demonstrate that the CBOT acted in bad faith, see Cargill, Inc. v. Board of Trade, 164 F.2d 820, 823 (7th Cir.1947), cert. denied, 333 U.S. 880, 68 S.Ct. 912, 92 L.Ed. 1155 (1948); Apex Oil Co. v. DiMauro, 641 F.Supp. 1246, 1282 (S.D.N.Y.1986), aff'd on other grounds, [1986-87 Transfer Binder] Comm.Fut.L.Rep. (CCH) p 23,703 (2d Cir.1987), and that the Resolution was not justified under the rule of reason. See, e.g., Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 243-44, 62 L.Ed. 683 (1918). Although the T & M Report, along with the Commission's supervision, does not immunize the CBOT from antitrust attack, the regulatory context in which the CBOT acted is certainly relevant to any examination of antitrust liability. MCI Communications, 708 F.2d at 1105-1111; Areeda & Hovenkamp, Antitrust Law, supra, p 227.1, at 230-34; Areeda & Turner, Antitrust Law, supra, p 223d, at 140. Finally, the district court on remand might--and we emphasize might--find it profitable to examine whether the AAM, whose members participated in the cash market, has standing under § 4 of the Clayton Act, 15 U.S.C. § 15, to bring an antitrust suit challenging anticompetitive practices in the futures market. See generally Kansas v. Utilicorp United, Inc., 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990); Associated Gen. Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); Blue Shield of Virginia v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); Nelson v. Monroe Regional Med. Ctr., 925 F.2d 1555, 1561-65 (7th Cir.), cert. dismissed, --- U.S. ----, 112 S.Ct. 285, 116 L.Ed.2d 236 (1991); Areeda & Hovenkamp, Antitrust Law, supra, p 334.1, at 363-69. Apparently, the issue was never squarely joined before the district court.
 
 
 60
 We note with appreciation the helpful and thorough amicus briefs filed by the Commission and the United States, and further the United States' prompt compliance with our request to submit its views.
 
 
 61
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 Section 22(b) reads, in relevant part:
 (1)(A) A contract market ... that fails to enforce any bylaw, rule, regulation, or resolution that it is required to enforce by section 7a(8) and (9) of this title, (B) a licensed board of trade that fails to enforce any bylaw, rule, regulation, or resolution that it is required to enforce by the Commission, or (C) any contract market ... or license board of trade that in enforcing any such bylaw, rule, regulation, or regulation violates this chapter or any Commission rule, regulation, or order, shall be liable for actual damages sustained by a person who engaged in any transaction on or subject to the rules of such contract market or license board of trade to the extent of such person's actual losses that resulted from such transaction....
 (3) Any individual who, in the capacity as an officer, director, governor, committee member, or employee of a contract market ... willfully aids, abets, counsels, induces, or procures any failure by [the market] to enforce ... any bylaw, rule, regulation, or resolution referred to in paragraph (1) ..., shall be liable for actual damages sustained by a person who engaged in any transaction....
 (5) The rights of action authorized by this subsection shall be the exclusive remedy under this chapter available to any person who sustains a loss as a result of (A) the alleged failure by a contract market ... or by any officer, director, ... or employee to enforce any bylaw, rule, regulation, or resolution [that it is required to enforce by §§ 7a(8) and 9], or (B) the taking of action in enforcing any bylaw, rule, regulation, or resolution ... that is alleged to have violated this chapter, or any Commission rule, regulation, or order.
 CEA § 22(b), 7 U.S.C. § 25(b).
 
 
 [2]
 By delineating three variants of preemption, we do not intend to suggest that the lines between them are always clear-cut. See English v. General Elec. Co., 496 U.S. 72, 79 n. 5, 110 S.Ct. 2270, 2275 n. 5, 110 L.Ed.2d 65 (1990). The same holds for their proper application. Compare Gade v. National Solid Wastes Management Ass'n, --- U.S. ----, ---- - ----, 112 S.Ct. 2374, 2381-88, 120 L.Ed.2d 73 (1992) (plurality) (finding conflict preemption but no express preemption) with id., --- U.S. at ---- - ----, 112 S.Ct. at 2388-91 (Kennedy, J., concurring) (finding express preemption but no conflict preemption) with id., at ----, 112 S.Ct. at 2391-95 (Souter, J., dissenting) (finding no preemption whatsoever)
 
 
 [3]
 Unfortunately, neither party addressed the CEA's structure or legislative history in any degree of detail. This omission is surprising, particularly given the courts' consistent reliance upon these sources to discern congressional intent when the statutory text is ambiguous on the question of federal preemption
 
 
 [4]
 The statute provides, in relevant part:
 At least thirty days before approving any rules of major economic significance, as determined by the Commission, the Commission shall publish a notice of such rules in the Federal Register. The Commission shall give interested persons an opportunity to participate in the approval process through the submission of written data, views, or arguments.... The Commission shall approve such rules if such rules are determined by the Commission not to be in violation of this chapter or the regulations of the Commission and the Commission shall disapprove, after appropriate notice and opportunity for hearing, any such rule which the Commission determines at any time to be in violation of the provisions of this chapter or the regulations of the Commission.... At the conclusion of such proceedings, the Commission shall approve or disapprove such rule.
 CEA § 5a(12); 7 U.S.C. § 7a(12).
 
 
 [5]
 The Commission has defined the term "emergency" as, among other things,
 [a]ny ... occurrence or circumstance which, in the opinion of the governing board of the contract market, requires immediate action and threatens or may threaten such things as the fair and orderly trading in, or the liquidation of or delivery pursuant to any contract for the future delivery of a commodity ... on such contract market. Occurrences and circumstances which a governing board of a contract market may deem emergencies include
 . . . . .
 (B) Any actual, attempted, or threatened corner, squeeze, congestion, or undue concentration of positions....
 
 
 [17]
 C.F.R. § 1.41(a)(4)(ii)
 
 
 [6]
 The Commission has been given a full opportunity to act, thus satisfying the primary jurisdiction requirement established in Ricci, supra. See also Chicago Mercantile Exch. v. Deaktor, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973) (per curiam)
 
 
 [7]
 The General Accounting Office, at the behest of the Senate Agriculture Committee, investigated the CBOT's adoption and publication of the Resolution, and concurred with T & M's conclusion that the CBOT had complied with the CEA
 
 
 [8]
 Along similar lines, the CBOT argues that CEA § 22, 7 U.S.C. § 25, impliedly repeals antitrust actions brought by those individuals whose injuries do not arise from their trading on a futures exchange. As we observed when discussing implied preemption, however, that provision, by its terms, excludes non-traders from recovery under the CEA, but not under other federal or state laws. See p. 1154 supra
 
 
 [9]
 Alternatively, the CBOT could argue that its action was compelled by a statute or regulation, namely CEA § 5(d), 7 U.S.C. § 7(d), which requires it to enforce rules to ensure fair trading and CEA § 5a(12), 7 U.S.C. § 7a(12), which authorizes it to invoke emergency resolutions to prevent market disruption due to a threatened market cornering. This, however, is the essence of the suit: was the CBOT action taken pursuant to the statute and regulations, making it unassailable by the AAM, or was the emergency resolution adopted in bad faith, not to prevent market disruption but to further private interests, and therefore outside the statutory authority and open to Sherman Act liability? If the CBOT acted in bad faith and thus outside the scope of its statutory authority, it will not enjoy immunity from the Sherman Act. Whether this particular resolution fits within the parameters of action compelled by statute or regulation, immunizing it from antitrust liability, requires a factual determination which cannot be made on this record. This issue was not addressed by the district court and remains open on remand
 
 
 [10]
 This issue was first raised by the United States in the amicus brief it filed after oral argument. See United States Br. at 14 n. 17. Significantly, the CBOT, in the brief we permitted it to file in response, did not contest the government's expressed view that the Commission's decision not to take formal action would not have been subject to judicial review
 
 
 [11]
 Several pages of the Report detail the futures and cash market positions held by affiliated firms and their customers, see T & M Report at 22-24, but they merely provide the statistical backdrop for analysis of the Board's and Committee's alleged conflict-of-interest