In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-3558

U.S. FUTURES EXCHANGE, L.L.C., *et al.*,

*Plaintiffs-Appellants*,

*v.*

BOARD OF TRADE OF THE CITY OF CHICAGO, INC., *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:04-cv-06756 — **Thomas M. Durkin**, *Judge*.

ARGUED DECEMBER 13, 2019 — DECIDED MARCH 23, 2020

Before MANION, KANNE, and BRENNAN, *Circuit Judges*.

MANION, *Circuit Judge*. This antitrust case comes to us
from the commodities and futures marketplace. As USFE tells
it, Defendants torpedoed its new futures exchange by delay-
ing the regulatory approval process and enacting an internal
rule that deprived the new exchange of liquidity. The real
question is whether Defendants violated the antitrust laws in
doing so. We hold they did not.

## I. Background

In the early 2000s, U.S. Exchange Holdings, Inc., and its subsidiary U.S. Futures Exchange, L.L.C. (together, "USFE"), set out to offer a then-novel electronic-based futures trading platform. Electronic trading posed a direct competitive threat to entrenched exchanges that utilized the more traditional but less efficient floor-trading model, like the Board of Trade of the City of Chicago, Inc. ("CBOT.")

USFE targeted February 1, 2004, as its launch date. That would have given USFE about a month to establish itself before a number of futures and options contracts were set to expire, at which time traders could transfer their business from CBOT and elsewhere to USFE. Before it could begin operations, however, USFE needed to be approved as a designated contract market ("DCM") by the Commodity Futures Trading Commission. USFE filed its DCM application in July 2003 and hoped for fast-track approval by mid-November.

The Commission solicited public comment as part of the application review. CBOT and another futures exchange, Chicago Mercantile Exchange Inc. ("CME"), raised fifty-four objections to USFE's application. Many other members of the public submitted critical letters and raised objections, too. At the close of the comment period, the Commission set a public hearing on USFE's application for December 17, 2003. But before the hearing could convene, Defendants CBOT and CME requested the matter be postponed due to scheduling conflicts. The Commission obliged.

In the background, USFE approached the Board of Trade Clearing Corporation ("BOTCC") to negotiate an agreement

for clearing services.[1] This would have provided USFE with access to essential startup liquidity in the form of open interest created by market participants and held at BOTCC.[2] The problem for USFE was that CBOT also used this clearinghouse. Once it caught wind that USFE intended to contract with BOTCC, CBOT proposed a new exchange rule—Rule 701.01—to the Commission for approval. The Commission approved the rule after more than a month of deliberation. Rule 701.01 compelled the transfer of CBOT's open interest from BOTCC to its new, exclusive clearing partner: CME.[3] By draining its open contracts from BOTCC, CBOT deprived USFE of access to a significant amount of liquidity.

The Commission finally approved USFE as a DCM on February 4, 2004, and USFE launched on February 8. According to USFE, the delay—attributable to Defendants—caused such uncertainty that market participants were unable and/or unwilling to trade on the new exchange. The exchange flopped.

USFE sued Defendants for violating the Sherman Antitrust Act and related state common law prohibitions against tortious interference. The case spent *fifteen years* in federal district court before reaching us. After multiple amended

---

[1] Every futures exchange must either provide its own clearing services or otherwise contract with a clearinghouse like BOTCC. A clearinghouse is an intermediary between buyers and sellers; it acts as the buyer for every seller and the seller for every buyer. The clearinghouse thus assumes counterparty risk; if a trade falls through on one end, the clearinghouse shields the other side.

[2] "Open interest" refers to trades or contracts that remain outstanding at the clearinghouse and is used as a predictor of liquidity.

[3] CME offers both clearing and trading services. It agreed to provide clearing services exclusively for CBOT in April 2003.

complaints and motions to dismiss, a venue change, on-and-off discovery, three rounds of summary judgment briefing, and reassignment to a new district judge, the matter culminated in summary judgment for Defendants. USFE appeals.

## II. Discussion

We review summary judgment *de novo*, asking whether a genuine dispute exists over any material fact. *Kopplin v. Wis. Cent. Ltd.*, 914 F.3d 1099, 1102 (7th Cir. 2019).

USFE's antitrust claims can be divided into two theories. The first is the "delay theory," whereby Defendants flooded the Commission with frivolous objections in order to stall DCM approval and harm USFE. Second, in the "open interest theory," Defendants conspired to deprive USFE of liquidity by transferring CBOT's open interest from BOTCC to CME.[4] We address each theory in turn.

### A.  Delay Theory: *Noerr-Pennington* and its Exceptions

In connection with USFE's DCM application, Defendants filed fifty-four objections (most, considered but rejected by the Commission) and submitted letters requesting the December 2003 hearing on USFE's application be postponed. Defendants engaged in this petitioning despite their apparent belief that USFE's application would be approved eventually.

The district court held this petitioning immune from antitrust liability under the *Noerr-Pennington* doctrine.[5] The

---

[4] The parties also debate whether USFE's open interest claims are actionable at all. The district court did not rule on this issue so neither will we.

[5] The doctrine takes its name from two Supreme Court decisions: *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961)

doctrine "extends absolute immunity under the antitrust laws to businesses and other associations when they join together to petition legislative bodies, administrative agencies, or courts for action that may have anticompetitive effects." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 841 (7th Cir. 2011) (internal quotation and citations omitted). The doctrine flows from First Amendment origins: antitrust laws do not supersede the people's right to petition their government in favor of a desired monopoly. *See id.* at 841–42 (citing *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 371 (7th Cir. 1987)). *Noerr-Pennington* immunity is not absolute, however. Exceptions exist for petitioners who present fraudulent misrepresentations or bring sham lawsuits.[6] USFE invokes both.

i.   *The "Fraudulent Misrepresentations" Exception*

Fraudulent misrepresentations made in an adjudicative proceeding before an administrative agency are not protected from antitrust liability. *Mercatus*, 641 F.3d at 842. Those made in a legislative, political setting, however, enjoy immunity. *Mercatus* identifies five considerations to weigh when drawing the line between legislative and adjudicative proceedings

(holding railroads' publicity campaign to promote legislation and law enforcement practices that harmed trucking industry did not violate the Sherman Act); and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 670 (1965) ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition.").

[6] *Mercatus* describes these exceptions as "two specific kinds of conduct" that trigger a single exception to immunity: the "sham exception," first mentioned in *Noerr* itself. *See Mercatus*, 641 F.3d at 842. We discuss them as separate exceptions to avoid confusing the distinction between "sham lawsuits" and the broader "sham exception" *Noerr* contemplates.

for *Noerr-Pennington* purposes: (1) the general nature of the authority exercised by the agency; (2) the formality of the agency's fact-finding process; (3) the extent to which fact gathering is subject to political influence; (4) whether the agency received any testimony made under oath, affirmation, or penalty of perjury; and (5) whether the agency acted ultimately as a matter of discretionary authority or instead acted in accordance with more definite standards subject to judicial review. *Id.* at 845–46. This is a threshold inquiry; the fraud exception "does not apply at all outside of adjudicative proceedings." *Id.* at 844.[7]

Applying *Mercatus*'s factors here, we conclude the district court classified the Commission's DCM application review process properly as legislative instead of adjudicative. *First*, we consider the nature of the Commission's authority when it reviewed USFE's application. The Commission's DCM review process mirrors its public rulemaking function, which includes entertaining *ex parte* meetings on proposed rules, providing notice to the public, and seeking comment before promulgating, amending, or repealing a rule.

In certain circumstances not present here, like when reviewing a decision to deny a DCM application, the Commission adjudicates. Blurring this line, USFE interprets the Commission's review of a denied application and the Commission's *initial* assessment of a DCM application as "different phases of the same proceeding." (Reply Br. at 4.) The

---

[7] Should an antitrust plaintiff overcome this threshold, it still must demonstrate the alleged misrepresentation "(1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding." *Mercatus*, 641 F.3d at 843. We do not address this second stage given the outcome here.

regulations reflect the opposite. The procedures governing in-itial designation are found at subpart 38.3. And as encom-passed by part 38, the designation procedures apply only to "every board of trade that *has been* designated or *is applying* to become designated as a contract market … ." 17 C.F.R. § 38.1 (emphasis added). They do not apply to boards that *have applied* but were *denied* designation. Instead, when the Commis-sion denies a DCM application, the aggrieved party may ini-tiate review of the denial through a new, distinct proceeding subject to the Commission's Rules of Practice, which govern "adjudicatory proceedings." 17 C.F.R. §§ 10.1, 10.1(a).[8] These Rules contemplate filing a complaint and notice of hearing, *see* §§ 10.21, 10.22, filing an answer, § 10.23, discovery, §§ 10.42, 10.44, and motions practice, § 10.26. An administrative law judge presides over all proceedings covered by the Rules, § 10.8, evidence must meet admissibility standards, § 10.67, and in stark contrast to the DCM application review process, *ex parte* communications are prohibited and even sanctiona-ble, § 10.10.

The Rules of Practice employ many signature adjudicative features, yet none applied to the Commission's review of USFE's application. The regulations illustrate a clear dichot-omy between the process for reviewing DCM applications and that for reviewing denials. We reject USFE's attempt to bring the two under the same roof.

*Second*, the Commission utilized an informal fact-finding process. Although the Commission compiled a "record," the contents of that record were not bound by any "strict rules of

---

[8] The regulations define "adjudicatory proceeding" as "a judicial-type proceeding leading to the formulation of a final order." 17 C.F.R. § 10.2(b).

relevance and admissibility" as if before a court or other adjudicative body. *Mercatus*, 641 F.3d at 845. The Commission was "free to base its actions on information and arguments that [came] to it from any source," including information, opinion, and argument submitted by the public. *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220, 228 (7th Cir. 1975).

*Third*, the weight afforded to *ex parte* communications and public comment subjected the Commission's fact-finding efforts to political influence—a hallmark of the legislative process. In *Mercatus*, a local hospital successfully petitioned the village board to deny development of plaintiff's interloping physician center. We held this petitioning immune from antitrust scrutiny based in large part on the parties' and the public's lobbying efforts:

> Both Mercatus and the Hospital engaged in *ex parte* lobbying of individual Board members prior to the hearings. Mercatus executives contacted or met personally with individual Board members, and at least one Board member even took a tour of Mercatus' facilities. A number of Lake Bluff residents also contacted the Board members to voice their views on the Mercatus project. … In fact, the lobbying was encouraged by the village president … .
>
> …
>
> At least one Board member, on his own initiative, contacted independent think tanks for guidance. Members of the general public were allowed to voice their opinions regarding Mercatus' proposed site plan.

641 F.3d at 848. These facts led us to label the board's review "decidedly legislative or political in nature." *Id.*

Much of the same occurred here. USFE's representatives, including outside counsel and at least one lobbyist, met with the Commission, its staff, and its attorneys on several occasions to discuss the DCM application. These meetings occurred over the phone and in person, *ex parte*. Commission staff visited USFE's facilities for a demonstration of its proposed trading platform. The Commission twice sought public comment on USFE's application and received letters from trading firms, individual traders, newsletter and magazine publishers, academics, and other government agencies. It reviewed and considered every one of these submissions before approving USFE's application. All of this activity was "perfectly legitimate" in the context of the Commission's DCM application review process, "as would not be the case in an adjudicative proceeding." *Id.*

*Fourth*, the Commission received no testimony under oath, affirmation, or penalty of perjury from the petitioning Defendants as part of the application review. A witness or other source of information in an adjudicative proceeding "is not 'at liberty to exaggerate or color his version of an event,' as might be possible in a more political or legislative setting." *Id.* at 845 (quoting *United States ex rel. Haywood v. Wolff*, 658 F.2d 455, 463 (7th Cir. 1981)). Requiring a perjury-backed oath or affirmation drives this home by "impress[ing] upon a witness the solemnity of the occasion and the importance of telling the truth." *Mercatus*, 641 F.3d at 845. But the Commission gave no such impression to Defendants or any other public commentators here. It did not require their written opinions and concerns to be made under penalty of perjury.

USFE points to the warning contained in "Form DCM": "Intentional misstatements or omissions of material fact may constitute federal criminal violations (7 U.S.C. § 13 and 18 U.S.C. § 1001) or grounds for disqualification from designation." 17 C.F.R. pt. 38, App'x A.[9] Form DCM—used to compile the usual information and exhibits all applicants must submit—and its warning do not apply to the challenged petitioning here, however. The Commission no doubt relied on the facts presented in USFE's application materials, submitted with the understanding that intentional misrepresentations could subject USFE to federal prosecution. But the Commission also devoted significant consideration to unsworn public opinions, diluting the importance of truthful and accurate information inherent in adjudicative settings. Each commentator other than USFE was free and welcome to present its views in any color. This factor leans legislative.

Consideration of the *fifth* and final factor is less one-sided. "The absence of definite standards" subject to judicial review "is more characteristic of purely political or legislative activity than of adjudication." *Mercatus*, 641 F.3d at 846; *see also Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1061 (9th Cir. 1998) (observing petitions to influence agency decisions that are "virtually

---

[9] The statutes cited by Form DCM—7 U.S.C. § 13 and 18 U.S.C. § 1001—criminalize knowingly submitting materially false or misleading information to the Commission in connection with a DCM application. Although they do not touch on "perjury," citation to these statutes similarly impresses upon the submitter that designation review and approval depends on accurate information. *See Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261–62 (9th Cir. 1982) (likening 18 U.S.C. § 1001 to perjury penalty in discussing the prohibitions against submitting false information to adjudicative bodies for anticompetitive purposes).

unguided by enforceable standards" and appealable only to a legislative body receive *Noerr-Pennington* protection).

Here, USFE had to demonstrate it met and would continue to comply with more than twenty statutory requirements in order to be designated. The parties debate the limits of the Commission's reviewing discretion and whether the requirements themselves qualify as "definite standards." We need not engage in these side disputes. At the very least, designation requires compliance with far more definite prerequisites than in *Mercatus*, where the local ordinance "provided *no* standards governing the grant or denial" of plaintiff's zoning application. 641 F.3d at 848 (emphasis added); *cf. Boone v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 896 (9th Cir. 1988) (immunizing petitioning of city council to approve a zoning plan that harmed plaintiffs; council's review held legislative based on broad discretion to approve or deny new projects whenever deemed "'necessary or desirable' to carry out the ends of redevelopment"). In addition, while "matters of discretionary authority" fall into the legislative basket, the Commission has no discretion to deny an application that meets the statutory requirements. And again, the Commission's assessment of USFE's application was subject to judicial review, albeit through a distinct proceeding as discussed above. These details illustrate several adjudicative aspects of the DCM application review process.

We emphasized in *Mercatus*, however, that "it may often not be clear whether, in a given circumstance, an agency is acting legislatively, adjudicatively, or perhaps somehow even in both capacities simultaneously." 641 F.3d at 844 (citation omitted). The agency process in this case involves a combination of legislative and adjudicative features. Nevertheless, the

Commission's exercise of rulemaking-like authority, the encouragement of lobbying and *ex parte* influence, a tolerance for petitions made outside perjury's confines, and informal fact gathering render the DCM application review process a legislative one. Thus, USFE cannot rely on alleged fraudulent misrepresentations to circumvent *Noerr-Pennington*.

ii. *The "Sham Lawsuits" Exception*

*Noerr-Pennington*'s "sham lawsuits" or "abuse-of-process" exception holds liable objectively baseless lawsuits brought in "an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993) ("*PRE*") (internal quotation marks and citations omitted). The sham exception is "extraordinarily narrow." *Kottle*, 146 F.3d at 1061; *see also* 1 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION 262 (4th ed. 2013) (The exception is "most difficult" to apply in legislative contexts, "where it is virtually impossible to identify the sham."). The Ninth Circuit has even doubted whether the exception applies at all where, as here, plaintiffs allege a "pattern" of petitions in the legislative arena: "[S]ubjecting the same defendant to antitrust liability because it engaged in numerous unsuccessful attempts" to petition a legislative body "would eviscerate the Petition Clause." *Kottle*, 146 F.3d at 1061.

The exception requires a two-step inquiry: (1) only if challenged litigation is objectively meritless may a court (2) examine the litigant's subjective motivation. *PRE*, 508 U.S. at 60. In other words, an antitrust plaintiff must "disprove the

challenged lawsuit's *legal* viability" before proceeding to the second, subjective step. *Id.* at 61. Objectively reasonable suits therefore enjoy *Noerr-Pennington* immunity regardless of the reasons for their filing.

An objectively reasonable lawsuit is one "reasonably calculated to elicit a favorable outcome." *Id.* at 60. Baseless, frivolous efforts, "as distinct from colorable suits brought in bad faith," receive no protection. *Creek v. Vill. of Westhaven*, 80 F.3d 186, 192 (7th Cir. 1996). Notably, a *successful* action self-proves its reasonableness and "certainly cannot be characterized as a sham." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 502 (1988); *PRE*, 508 U.S. at 60 n.5 ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."); *see also, e.g.*, *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) (rejecting plaintiff's argument that defendant filed sham lawsuits when none had been adjudicated in plaintiff's favor).

USFE insists the district court employed the wrong standard by relying on *PRE*. It argues Defendants' various comments, letters, etc., comprise a "pattern" of sham petitioning that triggers a more generous examination than what *PRE* calls for. This approach stems from the Supreme Court's language in *California Motor Transport Co. v. Trucking Unlimited*: "[A] pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes" have been used improperly "to deprive the competitors of meaningful access to the agencies and courts." 404 U.S. 508, 512 and 513 (1972). Filing petitions with "such a purpose or intent," the Court stated, would "fall within the exception to *Noerr*." *Id.* at 512.

The district court applied the correct standard. We do not agree *California Motor* provides a separate rubric to use whenever a "pattern" of sham filings is alleged. The First Circuit rejected this same reading of *California Motor* recently in *Puerto Rico Telephone Co. v. San Juan Cable LLC*, 874 F.3d 767 (2017), splitting from the four circuit opinions cited by USFE, all of which adopt some version of the view that *PRE* applies only to single-lawsuit cases while *California Motor* applies to all others.[10] The *Puerto Rico Telephone* panel reasoned persuasively:

> [There is no] pragmatic reason to presume that [*PRE*'s] protections for nonfrivolous petitioning activity disappear merely because the defendant exercises its right to engage in such activity on multiple occasions. One large lawsuit or intervention in an agency proceeding can impose much more of a burden on a competitor than might a series of smaller claims.

874 F.3d at 772.

Relying on *California Motor* and the just-mentioned four circuit opinions, USFE invites us to discard the first question of the two-part sham inquiry whenever more than a single petition has been made and to proceed only with the second step's evaluation of subjective motive. This position

---

[10] *See Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 178–81 (3d Cir. 2015); *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 363–64 (4th Cir. 2013); *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 101 (2d Cir. 2000); and *USS–POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL–CIO*, 31 F.3d 800, 810–11 (9th Cir. 1994).

misconstrues *California Motor* and ignores *PRE*'s thorough explanation of that opinion's role in the sham exception landscape. The Court in *PRE* described *California Motor* as requiring courts to draw the "difficult line" that *separates out* objectively reasonable claims from patterns of "*baseless*, repetitive claims" before finding a sham. 508 U.S. at 58 (emphasis added). In that sense, *California Motor*—issued more than twenty years before *PRE*—contains the very origins of the sham exception inquiry's first step: an objective reasonableness assessment.

*PRE* further confirmed the sham exception has never hinged on the petitioner's subjective intent alone. 508 U.S. at 59 (collecting cases). This aligns with the teachings of both *Noerr* and *Pennington*: "*Noerr* rejected the contention that an attempt 'to influence the passage and enforcement of laws' might lose immunity merely because the lobbyists' 'sole purpose … was to destroy [their] competitors.'" *Id.* at 57 (quoting *Noerr*, 365 U.S. at 138); the right of the people to petition for desired outcomes "cannot properly be made to depend upon their intent in doing so." *Id.* at 58 (quoting *Noerr*, 365 U.S. at 139); "'*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.'" *Id.* (quoting *Pennington*, 381 U.S. at 670). Accepting USFE's position would subvert these core principles.

Moreover, the Supreme Court has acknowledged the objective reasonableness inquiry with regularity since *California Motor*. Valid efforts to influence government action, for example, do not qualify as a sham, while insubstantial claims might evidence one. *PRE*, 508 U.S. at 58 (citing *Allied Tube*, 486 U.S. at 500 n.4; *Otter Tail Power Co. v. United States*, 410 U.S. 366, 380 (1973)). And in *City of Columbia v. Omni Outdoor Advertising,*

*Inc.*, the Court "dispelled the notion that an antitrust plaintiff could prove a sham merely by showing that its competitor's 'purposes were to delay [the plaintiff's] entry into the market and even to deny it a meaningful access to the appropriate … administrative and legislative fora.'" *PRE*, 508 U.S. at 59–60 (discussing and quoting 499 U.S. 365, 381 (1991)). That same "notion" describes USFE's argument precisely.

We stand with the First Circuit. Faced with only one alleged sham lawsuit, at no point did the *PRE* Court link its ruling to the number of suits or suggest the outcome would be different if it encountered multiple actions. We, too, find "little logic" in concluding a petitioner loses the right to file an objectively reasonable petition merely because it chooses to exercise that right more than once in the course of pursuing its desired outcome. *See Puerto Rico Tel.*, 874 F.3d at 772. Tracing the Ninth Circuit's lead in *USS–POSCO*, the Second, Third, and Fourth Circuits all reconciled *California Motor* and *PRE* "by reading them as applying to different situations." *USS–POSCO*, 31 F.3d at 810. Nothing in either opinion indicates as much. As the Court made clear in *PRE*, the sham exception's objective component is "indispensable" and *California Motor* does not suggest otherwise. 508 U.S. at 58.

Even if *PRE* and *California Motor* provided two different standards for non-pattern and pattern cases, respectively, the district court still did not err by applying *PRE*. Unlike the four circuit opinions endorsing this divide, Defendants here did not bring multiple lawsuits or petition across various legislative and administrative fronts.[11] This case is not characterized

---

[11] *See Hanover 3201*, 806 F.3d at 167–70 (defendants alleged to have pursued one state court lawsuit and three challenges before two state administrative bodies); *Waugh Chapel*, 728 F.3d at 357–58 (union defendants

by a wide-ranging "pattern." It involves a *single* legislative proceeding within which Defendants made multiple efforts to influence the Commission's decision regarding one overarching issue: whether to approve USFE's application. Just as motions within a lawsuit support the lawsuit's objective, individual lobbying efforts play a part in obtaining the ultimate desired legislative action. But in neither scenario do multiple filings, submissions, or other efforts transform one lawsuit or proceeding into many. *See, e.g.*, *Hanover 3201*, 806 F.3d at 169 and 181 (applying "pattern" standard where defendants initiated four distinct legal proceedings, but counting multiple letters submitted to a state agency as *one proceeding*).

With *PRE* in hand, the district court correctly determined Defendants' efforts did not "constitute the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief." *PRE*, 508 U.S. at 62. USFE counters by focusing on the fact that the Commission eventually *approved* USFE's application. According to USFE, its success in obtaining approval undermines the reasonableness of Defendants' fifty-four objections submitted in response to the application. This is especially so, USFE argues, because Defendants themselves knew the application would be approved in the end.

We reject USFE's position. Although a successful, winning petition proves its own reasonableness, it does not follow that

---

orchestrated a "barrage of legal challenges" that included multiple state court lawsuits and challenges to at least eleven separate zoning permits); *Primetime 24*, 219 F.3d at 101 (plaintiff alleged defendants abused provisions of the Satellite Home Viewers Act by conducting prelitigation challenges of thousands of individual subscribers); *USS–POSCO*, 31 F.3d at 811 (defendants filed twenty-nine separate lawsuits).

a petition lacks merit simply because it did not prevail. Besides, the petitioning here was colorable. Defendants' December 2003 scheduling letters persuaded the Commission to postpone the public hearing on USFE's application in light of legitimate and well-documented conflicts. The letters were not frivolous. Neither were Defendants' objections to USFE's application. Before granting USFE's application, the Commission held USFE to several remedial efforts it undertook in response to Defendants' objections regarding USFE's proposed one-member board, cross-border clearing link, and incentive programs. Furthermore, while Commission staff elected not to acknowledge many of the objections raised by other commentators, it addressed *each* of Defendants' fifty-four concerns. This speaks to the substantiality of Defendants' submissions, even those rejected by the Commission. Finally, whether Defendants believed or "knew" USFE's application would succeed does not change our analysis. Even if petitioners believe a regulator may ultimately approve an application, that does not eliminate their right to encourage the governing body to consider shortcomings in the application. Proving sham petitioning in a legislative context like this one is virtually impossible, and the record does not meet that high bar.

As with fraudulent misrepresentations, the "sham lawsuits" exception cannot save USFE's delay theory claims. *Noerr-Pennington* therefore immunizes Defendants' petitioning, even if that conduct delayed the Commission's approval of USFE's application and created market uncertainty that harmed USFE.

B.   Open Interest Theory: Implied Antitrust Immunity

USFE claims CBOT, conspiring with CME, enacted Rule 701.01 to transfer open interest away from USFE's preferred

clearinghouse and thus deprive USFE of much-needed liquidity. Defendants advocate for implied antitrust immunity because the Commission itself ordained the rule.

Regulatory statutes sometimes preclude application of the antitrust laws in explicit terms. If not, courts must determine whether the regulations *implicitly* preclude those laws' application. *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264, 270–71 (2007). Implied immunity arises when a regulatory regime clashes with the antitrust laws to create a "clear repugnancy" or "clear incompatibility" between the two. *Id.* at 275. Only a clear showing will do; findings of implied immunity are not favored otherwise. *Am. Agric. Movement, Inc. v. Bd. of Trade of the City of Chicago*, 977 F.2d 1147, 1158 (7th Cir. 1992) (citations omitted). Once the conflict has been demonstrated, the antitrust laws are "ousted" or "repealed" in favor of the regulatory scheme. *See Credit Suisse*, 551 U.S. at 271–72 (discussing *Silver v. N.Y. Stock Exch.*, 373 U.S. 341 (1963), and *Gordon v. N.Y. Stock Exch.*, 422 U.S. 659 (1975)).

Implied antitrust immunity has its roots in securities caselaw. In its most recent discussion of the doctrine, the Supreme Court in *Credit Suisse* identified a four-part test for implied immunity: (1) the existence of clear and adequate regulatory authority to supervise the activity in question; (2) evidence that the responsible regulatory entities exercise that authority in an active and ongoing manner; (3) a resulting risk that the antitrust laws and those governing the challenged activity, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct; and (4) whether the questioned activity lies squarely within the heartland of the regulated area. 551 U.S. at 275–77. Assessing these four factors, the district court held Defendants' role in

the open interest theory immune from antitrust scrutiny. USFE challenges the district court's findings on all but the final factor.

The facts here satisfy *Credit Suisse*'s criteria easily. *First*, the Commission has clear and adequate regulatory authority to approve exchange rules. *See* 7 U.S.C. § 7a-2(c); 17 C.F.R. § 40.5. It also has clear and adequate authority over clearinghouses and the clearing of futures transactions. *See* 7 U.S.C. § 7a-1(a)–(c).[12] *Second*, the Commission indeed exercised this regulatory authority by approving CBOT's proposed rule. The Commission's overall regulation in this area, moreover, was both active (Commission staff reviewed the proposal for over a month, soliciting and considering more than a dozen comment letters) and ongoing (the same competition concerns raised by Rule 701.01 had been studied during the previous year through a Commission roundtable and report). *Third*, the Commission approved Rule 701.01 *in spite of* potential anticompetitive effects, creating conflict with the antitrust laws. Per statute, the Commission must "take into consideration the public interest to be protected by the antitrust laws and endeavor to take the least anticompetitive means" when approving exchange rules. 7 U.S.C. § 19(b). Keeping with this mandate, the Commission considered and acknowledged comment letters raising anticompetitive concerns but

---

[12] Even though exchange and clearing rules can be self-certified without the Commission's input, that is not what happened here. Defendants voluntarily submitted Rule 701.01 for the Commission's *prior approval*. Because of this, the Commission was required to exercise its authority to review and approve. 7 U.S.C. § 7a-2(c)(4)(C) ("If prior approval is requested … the Commission *shall* take final action on the request ….") (emphasis added).

nonetheless deemed those concerns outweighed by the innovative gains to be had in the futures industry. With this and the other *Credit Suisse* factors met, the district court rightly concluded the Commission's approval of Rule 701.01 was "clearly incompatible" with the antitrust laws and their objectives.

Granted, the Supreme Court has not addressed implied antitrust immunity in the futures and commodities context, but this Circuit did so in *American Agriculture*—a decision predating *Credit Suisse* by twenty-five years. Seizing on this, USFE contends the district court erred by applying the four-part test from *Credit Suisse*—a securities case—instead of our instruction in *American Agriculture* that immunity may be implied so long as the challenged action receives "active, intrusive, and appropriately deliberative" scrutiny and approval from the relevant agency. 977 F.2d at 1167.

We disagree. USFE relies on the Court's statement in *Credit Suisse* that implied immunity determinations "may vary from statute to statute," 551 U.S. at 271, but that language does not make *Credit Suisse*'s factors irrelevant beyond the securities context. While the ultimate *determination* might depend on the regulations in play, the analysis does not. *Credit Suisse*'s test applies across regulatory boundaries and nothing in that opinion points to the contrary. Furthermore, that the Commission regulates exchanges and clearinghouses through a "principles-based approach"—as opposed to the "rules-based approach" of its securities counterpart—does not require us to apply wholly distinct standards to each regulatory scheme. Nowhere does *American Agriculture* indicate these inherent

differences warrant separate standards.[13] Indeed, *American Agriculture* derives its own "test" from the same *securities* cases that provide the foundation for *Credit Suisse*'s four factors—*Silver* and *Gordon*—and relies significantly on decisions from other regulatory contexts as well. *See Am. Agriculture*, 977 F.2d at 1164 (discussing *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983) (holding no implied antitrust immunity for alleged predatory pricing in telecommunications markets)). At most, *American Agriculture*'s emphasis on "active, intrusive, and appropriately deliberative" scrutiny is just another way to measure *Credit Suisse*'s second factor: active and ongoing exercise of regulatory authority.

Implied immunity is neither a securities doctrine nor a commodities doctrine. It is an antitrust doctrine. And the question of whether it applies in a given case is answered ably by *Credit Suisse*. The regulatory setting—securities, commodities, or something else—simply provides the backdrop against which the template is applied.

In any event, were we to accept USFE's argument, implied immunity would still attach under the "standard" it pushes. Given the Commission's focus on market competition in the year leading up to Defendants' proposed rule change, the Commission's solicitation and consideration of public comment and anticompetitive concerns, and its express, affirmative approval of Rule 701.01, this is not at all like the situation presented in *American Agriculture*. That case involved a challenge to an emergency resolution passed by CBOT to combat

---

[13] Following USFE's argument to its logical conclusion would compel a unique implied immunity test for every regulated industry. We do not glean that intention from either *Credit Suisse* or *American Agriculture*.

market manipulation. Unlike here, however, the Commission took no official action in response to that resolution; Commission staff conducted an informal, nonpublic investigation only. The Commission's "casual and modest" supervision and its "halfhearted and nonpublic review of the challenged practice" compelled us to reverse the district court's finding of implied immunity. 977 F.2d at 1165 and 1167. The unavailability of judicial review in *American Agriculture*—a factor considered "extremely important" to the implied immunity calculus—further directed our decision in that case. *Id.* at 1167. But here, USFE could have sought judicial review of the Commission's approval under the Administrative Procedure Act—it apparently elected not to. *See* 5 U.S.C. §§ 702, 706. All told, the Commission's approval of Rule 701.01 creates a "clear repugnancy" between the regulatory scheme and the antitrust laws. Implied immunity precludes USFE's open interest claims.

### III. Conclusion

Based on Defendants' petitioning before the Commission and their forced transfer of open interest, USFE brought this antitrust action to hold Defendants accountable for its failed exchange. But the *Noerr-Pennington* doctrine shields Defendants' petitioning from antitrust scrutiny. And since neither exception to the doctrine applies, USFE's delay theory fails. Moreover, the Commission's explicit approval of Rule 701.01 impliedly repeals the antitrust laws here, immunizing Defendants against USFE's open interest claims. The district court got it right for both theories, so summary judgment for Defendants is

AFFIRMED.